Julius **ARRINGTON** et al., Plaintiffs,

v.

**MASSACHUSETTS BAY TRANSPORTATION AUTHORITY**, Defendant.

Civ. A. No. 69–681.

United States District Court
D. Massachusetts.

Dec. 22, 1969.

---

13. 32 C.F.R. § 1625.2(b).

1356

Charles H. Lewis, Jr., Allan G. Rodgers, and Joel L. Selig, Mass. Law Reform Institute, Boston, Mass., for plaintiffs.

Edward F. McLaughlin, Jr., James W. Kelleher, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER DENYING PRELIMINARY INJUNCTION

GARRITY, District Judge.

Plaintiffs represent a class of black and Spanish-speaking persons who have applied for positions as drivers and collectors with the defendant Massachusetts Bay Transit Authority (MBTA). For purposes of this motion the class is limited to those who have taken the General Aptitude Test Battery (GATB) administered by the MBTA on September 7, 1968 and who still remain unhired on the rank list compiled from the results of that test.[1] Plaintiffs claim that the defendant's practice of offering employment to individuals in the order of their performance on that test is discriminatory and in violaton of both the Civil Rights Act of 1870 (42 U.S.C. § 1981) and the Civil Rights Act of 1871 (42 U.S.C. § 1983) insofar as it denies them privileges and immunities guaranteed by the Thirteenth and Fourteenth Amendments to the United States Constitution. Plaintiffs seek a declaratory judgment to that effect and preliminary and permanent injunctions ordering the defendant to institute a hiring system which is non-discriminatory. The matter has come before the court on plaintiffs' motion for a preliminary injunction. The court held an evidentiary hearing and the parties have filed briefs.

The named plaintiffs representing the class referred to above also belong to a group of 76 individuals who completed a six-week training program sponsored by the MBTA and conducted at Opportunities Industrialization Centers of Greater Boston, Inc. (OIC). The OIC program was designed to aid black applicants for positions with the MBTA as drivers or collectors by prescreening them for the job and then preparing them to take and score well on the GATB.

At the hearing the court ruled that the group of these OIC applicants not yet hired was a class for purposes of Rule 23, Fed.R.Civ.P. This was an erroneous limitation of the class because the gravamen of the complaint is racial discrimination and there are approximately three times as many non-OIC black applicants as there are OIC applicants. Membership in OIC adds nothing to the rights of plaintiffs either as individuals or as representatives of any group. The court's ruling is therefore modified to include all black and Spanish-speaking persons who would be adversely affected by the alleged discrimination.

The General Aptitude Test Battery is a series of tests designed to measure nine separate aptitudes ranging from general intelligence to manual dexterity. Defendants administer this test at two-year intervals to provide a pool of applicants for positions as either drivers or collectors. The applicants are ranked in descending order according to the total number of correct answers to the test questions. Thus the individual with the highest score has the lowest ranking number. Applicants are called in the order of their rank for final screening and, as openings occur, for employment. Prior to the present rank list, the MBTA had established two previous lists, one in 1965 and another in 1967. The two-year lives of both of these expired before the names on the lists were exhausted so that the applicants who performed most poorly on the tests were eliminated from job opportunities. However, there is no minimum score that is necessary to qualify for employment with the MBTA and evidently the defendant is not unwilling to hire even the poorest test performer simply because of his low score.

With respect to the 1965 and 1967 lists there are no records extant to indicate either equality or inequality in the racial patterns. However, of the total of 1533 candidates that took the GATB test on September 7, 1968, approximately 300 of these were blacks. Out of that number

---

1. To avoid pointless repetition, the class will be referred to as if it were composed entirely of black applicants. For the same reason, applicants other than those in the class will be referred to as the white applicants.

only 60 achieved a score that put them within the top 1000 on the rank list. This means that only 20% of the black applicants as compared with 75% of the white applicants were within the first two-thirds of those to be offered positions.

The results of this test simply add to the already substantial body of evidence that black persons and other disadvantaged groups perform on the average far below the norm for whites on generalized intelligence or aptitude tests. See generally Cooper and Sobol, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 1969, Harv.L.R. 1598, 1637–1679. The reason for this deficiency in performance has not been related to any lack of innate intelligence but rather primarily to the socio-economic realities of a history of economic, cultural and educational deprivation to which the black race has been subject. See Hobson v. Hansen, D.D.C., 1967, 269 F.Supp. 401, aff'd sub nom. Smuck v. Hobson, 1969, 132 U.S.App.D.C. 372, 408 F.2d 175.

Although there is no contention of any intent to discriminate against black or Spanish-speaking persons by means of this test, it is fair to say that its implementation by the MBTA, a public agency and a political subdivision of the Commonwealth of Massachusetts, produces a *de facto* racial pattern of classification adversely affecting these minority groups.

 Whenever state action is creative of a classification among its citizens such that burdens or benefits flow unequally, that classification is constitutionally suspect. The legitimacy of the objectives producing the classification must be adequately justified and of sufficient importance to overcome the evils of the inequality engendered. See, e. g., Shapiro v. Thompson, 1969, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600. It is not enough that the factors producing the classification and the consequent inequality are themselves objectively neutral and

without a background of even latent discriminatory purpose: when the effect is to deprive some citizens of rights that should be equally available to all, then there must be a compelling justification. See, e. g., Harper v. Virginia Board of Elections, 1966, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169. Thus when a seemingly neutral or objective hiring standard, such as a generalized aptitude test fairly administered, produces such factually discriminatory results with respect to important rights of equal opportunity for employment by an agency of the state, then the demands of equal protection under the Fourteenth Amendment warrant judicial inquiry into the justification for that hiring criterion.

 Using an aptitude test to determine eligibility for employment or the order of hiring is certainly justified if there is a relationship between the aptitudes tested and the demands of the work to be performed. It is not unreasonable to prefer those with superior ability to score well on a test if that means that they are also more likely to do well on the job. See United States by Clark v. H. K. Porter Co., N.D.Ala., 1968, 296 F.Supp. 40. A hiring practice related to ability *to perform is not itself unfair even if it* means that disadvantaged minorities are in fact adversely affected.

 However, if there is no demonstrated correlation between scores on an aptitude test and ability to perform well on a particular job, the use of the test in determining who or when one gets hired makes little business sense. When its effect is to discriminate against disadvantaged minorities, in fact denying them an equal opportunity for public employment, then it becomes unconstitutionally unreasonable and arbitrary. See Hobson v. Hansen, *supra.*

The difficult issue in situations such as these is the determination of the level of business relevance necessary to justify the utilization of a test. It is one thing to demand that a test be designed to measure abilities relevant to job performance and be an accurate determinant

of those abilities, but quite another to decide what showing is adequate to indicate that a particular test is performing that function successfully. See United States by Clark v. H. K. Porter Co., *supra.*

■ The evidence received at the hearing on plaintiffs' motion in this case, however, indicates that here we do not even have a close question. There was no evidence of any relevance of the GATB test to the duties of either a driver or a collector, nor that the test measured any abilities important to job performance. No applicant is disqualified because of a low score on the test and, to a considerable degree, the determination of ability to perform is made after hiring and during a probationary training period. Moreover, the manner in which the test was administered ignores whatever specific abilities may be deemed necessary for employment with the defendant. The GATB is a battery of tests designed to measure a series of differing aptitudes. The aptitude factors measured include general intelligence, verbal aptitude, numerical aptitude, spatial aptitude, form perception, clerical aptitude, motor coordination, finger dexterity and manual dexterity. The defendant did not distinguish among the aptitudes measured but simply added up the raw scores of all the parts of the test. Moreover it did not distinguish between drivers and collectors. They took the same test and were scored in the same manner. Thus somehow the defendant was equating the duties of one who drives a bus with one who collects change in a toll booth. Likewise, the defendant made no effort to relate relative success on the test to actual job performance. No validating norms have been established from the GATB for the jobs of bus driver or collector and the MBTA has made no validating studies on its own in any attempt to check actual performance against success on the test. At best the defendant has used the test on the unsupported assumption that better test takers are also better drivers or collectors.

This is not an adequate justification when the result is such an adverse impact on disadvantaged minorities. Plaintiffs have, therefore, made a sound preliminary showing of ultimate entitlement to a declaratory judgment in their favor.

■ However, in order to obtain preliminary relief prior to a hearing on the merits, plaintiffs must also show that they will suffer irreparable injury unless the MBTA is enjoined from the continued use of this particular rank list, and this they have not done. The court comes to this conclusion on the basis of the present status of the list. Approximately 1533 candidates took the test on September 7, 1968. The list compiled from its results was put into effect on January 8, 1969. By October 7, 1969, the last day of the hearing, all of those having taken the test had been called in for interviews and had completed processing. From that number, 1017 had either been rejected by the defendant for various reasons or had refused the appointment when it was offered. That left a total of 516 who have been found fully qualified and eligible for hiring. Of these 207 have already been hired, the last one ranking number 953. The remaining 309 eligible applicants for the positions of driver and collector are therefore within the 580 poorest scorers on the test. The racial composition or rank positions of these remaining applicants is not known precisely but is approximately 50% blacks and Spanish-speaking persons. Thus the same adverse racial impact that is evident from the list as a whole is not attributable to the list in its present status.

The results of the relief the court could grant are also relevant. Any preliminary injunction that might issue could not in equity demand that the racial imbalance already created by the running of the list be redressed by according special treatment to the remaining blacks. That could only be at the expense of the remaining whites who, far from being beneficiaries of previous discriminations, may well be just as much the innocent victims of a system of hiring that burdens the cultur-

ally disadvantaged. Moreover, because of the relative lack of racial imbalance in the present makeup of the list, it is not clear that an order enjoining the use of the test results and directing random selection by lot would be of any substantial advantage to the plaintiffs' class. Finally the court in considering use of its equity powers is cognizant of the innocent expectations of employment in the near future entertained by both black and white applicants near the top of the list in its present status.

Accordingly, for lack of showing of irreparable harm, despite a likelihood of success on the merits, plaintiffs' motion for a preliminary injunction is denied.