Bernice ARMSTEAD et al., Plaintiffs,

v.

STARKVILLE MUNICIPAL SEPARATE
SCHOOL DISTRICT et al., Defendants.

No. EC 70-51-S.

United States District Court,
N. D. Mississippi, E. D.

April 7, 1971.

Thomas H. Freeland, III, and G. A. Gafford, of Freeland & Gafford, Oxford, Miss., Stephen J. Pollak, David Booth Beers, and Kenneth L. Penegar, of Shea & Gardner, Washington, D. C., David Rubin, National Ed. Ass'n of the U. S., Washington, D. C., for plaintiffs.

William Q. McKee, and Edward McDowell, of McKee & McDowell, Starkville, Miss., Thomas J. Tubb, of Tubb & Stevens, West Point, Miss., A. F. Summers, Atty. Gen. of Miss., Jackson, Miss., for defendants.

## MEMORANDUM OPINION

ORMA R. SMITH, District Judge.

The amended complaint for declaratory and injunctive relief filed in this action contains four counts. By agreement of the parties and with consent of the court Count I was severed from Counts II, III and IV for separate hearing and determination. The hearings on Count I have been concluded. After the submission of proposed findings of fact and conclusions of law by the parties, the issues involved in Count I are now ripe for decision by the court.

The court's findings of fact and conclusions of law, pursuant to Rule 52(a) Fed.R.Civ.P., follow in this opinion.

Plaintiffs in Count I are the National Education Association (NEA), the Mississippi Teachers Association (MTA), and nine black teachers who taught in the Starkville Municipal Separate School

District during the academic year 1969–70—Bernice Armstead, Betty D. Bardwell, Charles E. Brown, Tinnie Collier, Robbie L. Johnson, Fred A. McFadden, Wilfred J. Moore, Sam L. Skinner, and Carroll T. Washington.

The NEA is a nationwide professional organization for educators. It has a direct interest in the standards and procedures used to employ teachers and frequently provides legal assistance to educators when it believes that important professional or civil rights are at stake. The MTA is a statewide professional organization for teachers and is an affiliate of the NEA. Most of its members are black. MTA members pay annual dues of $15.00. Some of the plaintiff teachers are members of the MTA.

The defendants are the Starkville Municipal Separate School District of Oktibbeha County, Mississippi; its former superintendent, B. Hall Buchanan, its current superintendent, Paul D. Armstrong; and its Board of Trustees, Emmett Black, Paul Millsaps, James E. Hill, Hunter Corhern, and Joe T. Mosley. The Superintendents and Board of Trustees are named as parties in their individual and official capacities.

Count I of the amended complaint alleges that defendants have unlawfully refused to reemploy black teachers and to hire black applicants for teaching positions. Plaintiffs pray, *inter alia,* for a permanent injunction preventing defendants from enforcing School Board Policy 13–69 which requires in-service teachers and applicants for teaching positions to achieve a certain score on the Graduate Record Examination (GRE) or a Master's Degree as a precondition to retention and employment in the system. The amended complaint also seeks to recover damages sustained by those plaintiffs who were not reemployed by defendants for the academic year 1970–71 because of Policy 13–69.

Pursuant to Rule 65(a) (2) Fed.R. Civ.P. and the agreement of the parties, the trial on the merits was consolidated with the hearing on plaintiffs' motion for preliminary injunction and held on September 3 and 4, 1970. Following completion of the hearing and closing arguments of counsel on September 4, 1970, this court entered a preliminary injunction requiring defendants to reemploy those plaintiff teachers who had not obtained teaching positions for the 1970–71 school year, namely, Bernice Armstead, Betty D. Bardwell, Sam L. Skinner and Carroll T. Washington.

This cause of action arises under Section 1 of the Civil Rights Act of 1871, 17 Stat. 13, 42 U.S.C. § 1983. This court has jurisdiction pursuant to 28 U.S.C. § 1343.

### The Racial Composition of the Starkville School System

During the academic year 1969–70 the student enrollment in the Starkville Public Schools was 4,313. The racial composition of the student body during that year was approximately 53 percent white and 47 percent black.

Through February 5, 1970, the date of this court's desegregation order in Montgomery v. Starkville Municipal Separate School District, Civ. No. EC 6937 (A)–S defendants maintained a dual school system based upon race. At that time there were one white high school, one white junior high school, two white elementary schools, one black high school, one black middle school, and two black elementary schools in the system; one or two Negro teachers taught in the white schools and 23 white teachers taught in the black schools. The four white schools were administered by four white principals and the four black schools were administered by three black principals and a black "head teacher".

On February 5, 1970, this court ordered that the defendants "immediately begin to operate a unitary school system as required by the Supreme Court of the United States in Alexander v. Holmes County Board of Education [396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19] * * *" and "permanently enjoined [defendants] from discriminating on the basis of race." Montgomery v. Starkville Munic-

ipal School District, Civ. No. EC 6937 (A)–S. This order also expressly required defendants to integrate the faculty of the Starkville system according to the provisions of Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1969) (*en banc*).

During the academic year 1969–70, there were 191 teachers and principals in the Starkville school system: 134 whites and 57 blacks. The defendants reduced the faculty by 43 positions for the school year 1970–71. At the time of the trial of this case, defendants had hired for the academic year 1970–71 148 teachers and principals: 117 white and 31 black. This represents a faculty reduction of 22 percent. The faculty reduction was racially disproportionate. The number of black teachers fell from 57 to 31—a reduction of 46 percent. The number of white teachers, on the other hand, fell from 134 to 117—a reduction of 13 percent. For the 1970–71 school year, defendants hired 32 new teachers. All were white.

For the school year 1970–71, defendants increased the number of white principals from four to six. The number of black principals was reduced from three to one. Defendants combined one black elementary school and one black junior high school, eliminating the job of one black principal. Another black principal's departure from the Starkville school system is the subject of Count II of the amended complaint and has been severed for separate hearing. Defendants replaced the black head teacher with a white principal.

Defendants maintain that the racial imbalance of the faculty for the year 1970–71 results from the implementation of School Board Policy 13–69. That policy now governs the hiring and retention of teachers.

*The Standards and Procedures Governing the Selection of New Teachers in Effect Prior to the Implementation of Policy 13–69*

Prior to the implementation of Policy 13–69, defendants required each new applicant for a teaching position to complete and submit an application form on which the following data, among others, are requested: prior education, teaching certificates, teaching experience, the names and addresses of five references; and the position desired. Defendants continue to use this form with the addition of a request for information indicating whether the applicant meets the requirements of Policy 13–69.

In the event the superintendent or a principal decided to pursue an application, he was to request references from the five persons named in the application. Defendants provided the recommending parties with a form asking them to evaluate the candidate with respect to 16 criteria:

Appearance
Voice
Personality
Cooperativeness
Knowledge of Subject
Use of English
Teaching Techniques
Skill in Discipline
Pupil Relationships
Parent Relationships
Professional Attitude
Social and Civil Attitudes
Health: General Vitality
Health: Emotional Stability
General Moral Integrity
Spiritual Depth

In addition, the interested principal would interview the applicant and was to evaluate him or her on the basis of the same 16 criteria. Then the principal, if so inclined, recommended the applicant to the superintendent.

On the basis of the application, references, recommendations, the applicant's race, and the school's vacancies, the superintendent decided whether to recommend the applicant to the Board of Trustees. That Board makes the final decision as to all new hires, but it considers only those applicants recommended by the Superintendent.

*The Standards and Procedures for Re-Employment of In-Service Teachers Which Were in Effect Prior to the Implementation of Policy 13-69*

Mississippi teachers do not have the protection of a State teachers' tenure statute. In March of each year all teachers in the Starkville school system are asked to file forms stating whether they intended to remain in the employ of the Starkville Public Schools. Then follows a series of recommendations, beginning with the principal and passing to the superintendent and then to the board.

Prior to the implementation of Policy 13-69, a teacher, once hired by the Starkville School Board, could generally expect to be reemployed each year as long as the teacher wished until retirement. Thus, a principal's decision to recommend retention of a teacher was determinative of the decision to reemploy him in virtually every case.

Prior to the implementation of Policy 13-69, principals were directed to base their recommendations as to reemployment of each teacher upon an evaluation of that teacher in light of the 16 criteria above mentioned. In making recommendations concerning retention of inservice teachers, Superintendent Armstrong has considered the effectiveness of teachers, their ability to teach subject matter and children, qualifications in terms of degrees, added hours of credit, the area of endorsement, the demonstrated ability to teach children, as well as experience. The Board of Trustees considered these standards and procedures for determining whether to reemploy inservice teachers to be adequate.

*School Board Policy 13-69*

On April 18, 1968, the School Board adopted new standards for the hiring and retention of teachers, effective commencing with the 1970-71 academic year. The new standards, which supplemented the prior standards and procedures, were as follows:

*For Teachers Employed On or Before April 18, 1968:* To qualify for retention as a teacher commencing with the academic year 1970-71, such teachers must attain one of the following:

(1) A combined score of at least 640 on the verbal and quantitative sections of the Graduate Record Examinations (GRE); or

(2) A ranking of the 50th percentile, or higher, on the GRE in education or in the special subject matter field in which the teacher is endorsed; or

(3) AA Teaching Certificate, or a master's degree in any field, or a showing that the candidate needed only three more hours of credit to complete the master's degree.

*For Teachers Employed After April 18, 1968:* To qualify for retention for the 1970-71 school year or to qualify for initial hiring for that year and ensuing years, a teacher must attain one of the following:

(1) A minimum score of 750 on the verbal and quantitative sections of the GRE; or

(2) A percentile score of 60 or above on the advanced section in education or in the special subject field in which the candidate is endorsed to teach; or

(3) A score of 500 on the commons sections of the National Teacher Examination and a score of 500 on the teaching field section of the NTC, as one or two candidates have done; but this only qualifies the candidate for provisional status, and the candidate must take and pass the GRE or he will be dismissed at the end of his second year in service if not at the end of his first year in service.

(4) AA Teaching Certificate, or a master's degree in any field, or a showing that the candidate needs only three more hours of credit to complete the master's degree. (An AA Teaching Certificate indicates that the teacher has satisfied, *inter*

*alia,* the requirements for a Master's Degree.)

Policy 13–69 was adopted by the School Board while under increasing pressure to integrate the Starkville school system. Prior to adopting the policy, the School Board on March 4, 1968, approved a long range plan for faculty and student desegregation. The Department of Health, Education, and Welfare then rejected that plan. On March 20, 1968, the Board specially met to consider the letter of HEW disapproving the long range plan. On March 28, 1968, the Board requested its Superintendent to recommend a plan for minimum qualifications for incoming teachers, and three weeks later the Board adopted Policy 13–69.

Before the School Board established the GRE cutoff scores in Policy 13–69, Assistant Superintendent Muse contacted Mississippi State University and ascertained the minimum GRE scores required by the University for graduate work.

When Policy 13–69 was adopted by the defendants on April 18, 1968, Mississippi State University required applicants for "regular" admission to the Graduate School to attain a score of 900 on the GRE; those applying for "provisional admission" to the Graduate School were required to attain a score of 700. Mississippi State University is the only university located in Starkville and was the natural resort for Starkville's teachers who, because they had not made the required score on the GRE, needed to obtain a Master's Degree or an AA Certificate to qualify for retention under Policy 13–69.

The provisions of Policy 13–69 allowing in-service teachers to qualify for re-employment by obtaining a Master's Degree or an AA Teaching Certificate, as a practical matter, do not constitute a meaningful alternative to achieving the required minimum score on the GRE because similar or higher GRE scores were required for admission to graduate school at Mississippi State University.

As a practical matter, the provisions of Policy 13–69 allowing applicants for teaching positions to qualify by obtaining a Master's Degree an AA Teaching Certificate do not offer college seniors and recent college graduates a meaningful alternative to obtaining the required minimum score on the GRE; nor in terms of expense and time are these provisions a meaningful alternative to those for qualification by making the required score on the GRE.

The provisions of Policy 13–69 allowing teachers and teacher applicants to qualify for retention and hiring by scoring in the 50th and 60th percentiles respectively on the Advanced Test in Education or in their subject matter field set standards which are too high to constitute a meaningful alternative to the other routes for qualification set by the policy.

### The Graduate Record Examinations

Educational Testing Service (ETS) designs, produces and administers the Graduate Record Examinations. It also designs, produces and administers a broad range of more than 75 other standardized testing programs, including such examinations as the College Board Examinations, the Law School Aptitude Test and the National Teacher Examinations. Begun in 1947, the extent of the participation and experience of ETS in the field of testing is indicated by the fact that each year ETS tests approximately five million individuals through its various examinations.

Plaintiffs presented as their expert witness Dr. Winton H. Manning, Vice President of ETS in Charge of Testing Programs, and defendants presented as their expert witness Dr. Stephen Knezevich, a Professor of Education Administration at the University of Wisconsin. Defendant School District also presented evidence on the feasibility of using the GRE in the selection of teachers for its faculty through both the former and present superintendents of its schools.

While much of the testimony of Dr. Manning and Dr. Knezevich was in har-

mony, these witnesses differed as to matters of fact and judgment concerning the use of the GRE.

The GRE offers two different types of tests: an Aptitude Test and the Advanced Tests. The Aptitude Test contains a verbal section dealing with the candidate's knowledge of words and ability to comprehend reading materials and a quantitative section dealing with mathematical reasoning and the interpretation of graphs and charts. Advanced Tests are offered in twenty specialized areas including education, biology, economics and other disciplines.

Measurement specialists evaluate the appropriateness of the use of a test for the selection of candidates on two bases. First, the examination's "reliability" or the degree to which it consistently measures whatever it does in fact measure. Expressed another way, reliability concerns the likelihood that an individual will attain the same score on retesting or on taking an alternate form of a test. The second and more important criteria is "validity." Validity expresses the degree to which a test actually measures whatever it is used to measure.

Reasonable testing practices require that studies be made to demonstrate that an examination to be used to select persons for positions as elementary or secondary school teachers is valid and reliable for that use.

The GRE are designed to develop information about the academic preparation of students "to assist graduate schools and departments in the selection of qualified students for admission to graduate study, primarily for the doctorate, and in the determination of financial aid for such students". The GRE were not designed for use in the selection of elementary or secondary school teachers, or for the purpose of measuring a candidate's preparation for teaching, or for the purpose of identifying those who are or will be competent teachers at those academic levels. ETS has not conducted any studies that would demonstrate that the GRE are valid and reliable instruments for selecting public school teachers. Defendants have not validated the use of the GRE for this purpose. Neither expert witness knew of any other attempt by others to validate the use of the GRE examinations for this purpose.

No elementary or secondary school system, other than Starkville, has used the GRE in hiring and retaining teachers.

The reliability and validity of the GRE as a means of identifying effective teachers is unknown. There are no empirical data or studies which suggest that one may predict from GRE scores who will be effective public school teachers.

Effective teachers must be knowledgeable in the subject areas that they teach. The GRE does not identify those persons who have such limited knowledge of a subject or such limited intelligence that they cannot teach effectively. The examination tests an individual's capacity for advanced studies at the master's and doctoral levels, and the persons tested generally are those who have ranked in the upper third of their college class. Accordingly, low rankings on the GRE do not mean that a teacher does not have the knowledge or skill requisite for effective classroom performance in elementary and secondary schools.

Of the 16 criteria defendants have used for selecting teacher applicants and for recommending teachers for retention, only two are measured at all by the GRE, and that measurement is made in terms of the applicant's potential to be a successful graduate student.

At the time they adopted Policy 13–69 defendants recognized that the GRE would not separate competent from incompetent teachers and teacher candidates. The Superintendent testified that the standards established in Policy 13–69 have "nothing to do with determining teacher competency. We never have intended for it to. Always we have realized that it wouldn't do it."

Defendants rely exclusively on the GRE in refusing to reemploy and to

hire those in-service teachers and teacher applicants not making the cutoff scores established in Policy 13–69.

ETS recommends that GRE cutoff scores not be used by universities and colleges in admitting students for graduate work. Defendants, in fixing GRE cutoff scores to be used in the hiring and rehiring of teachers, did not conduct studies deemed necessary by recognized testing authorities to determine what cutoff score, if any, would be a valid and reliable measure for this purpose; nor did defendants conduct studies on the threshold question whether any cutoff score would be used if the GRE were to be relied upon in hiring and rehiring teachers and teacher applicants.

*Policy 13–69 Has Fallen More Heavily on Black Teachers and Teacher Candidates Than Upon Whites*

Prior to the time this case was heard, none of the "new hires" for 1970–71 were black. Six black applicants had met the requirements of Policy 13–69. Policy 13–69 has disproportionately reduced the number of black teachers in the school system. According to figures supplied by defendants, 16 of 57 black teachers and 9 of 134 white teachers failed to qualify under the standards of Policy 13–69. Policy 13–69, therefore, disqualified 28 percent of the black teachers in the system and 6.7 percent of the white teachers in the system in 1969–70.

ETS made a computer check of GRE scores achieved by students reporting attendance at predominately white and black institutions of higher learning in Mississippi during the period 1968–1970. The racial make-up of these was determined from the Department of Health, Education, and Welfare's publication reporting the enrollment by race in Mississippi institutions. While the GRE scores from the predominately white institutions might include those of a few Negroes in attendance, the highest possible number is still so small as to have no meaningful impact on the averages complied and attributed to the whites attending those institutions. Virtually no whites have been in attendance at the black schools. The results of this ETS computer run are confirmed by the results of a separate study conducted by ETS using the Undergraduate Program Examination, which is the equivalent of the GRE, where the race of each of 24,-556 persons taking the test was identified. Accordingly, the court accepts the scores reported to be from the predominately white institutions as being the scores of white students and the scores reported to be from the predominately black institutions as being scores of black students.

Scores on the GRE Aptitude Test from the predominately white institutions were reported for 9,150 students and from the predominately black institutions for 1,-339 students. At the white institutions 2,247 students reported scores for GRE Advanced Test in Education and the corresponding figure at the black institutions was 226. The number of students reporting scores on the GRE Aptitude Test and on the Advanced Test in Education is in each case large enough to permit reliable and valid comparisons between the two racial groups of students.

During the period 1967–1970, nine percent of the white students attending Mississippi colleges and universities and taking the GRE Aptitude Test failed to attain a score of 640 whereas 62 percent of the black students attending such schools and taking the GRE Aptitude Test failed to attain this score.

During the period 1967–1970, 23 percent of the white students attending Mississippi colleges and universities and taking the GRE Aptitude Test failed to attain a score of 750 whereas 83 percent of the black students attending such schools and taking the GRE Aptitude Test failed to attain this score.

The alternative means of qualifying under Policy 13–69 by making the required percentile of those taking the GRE Advance Tests across the nation are much more demanding. Seventy-eight percent of the white students and 97 percent of the black students failed to reach

the 50th percentile on the GRE Advanced Test in Education which was an alternative requirement for teachers in service on April 18, 1968. And 84 percent of the white students and 98 percent of the black students failed to reach the 60th percentile on the GRE education examination, which was an alternative requirement for teachers commencing service after April 18, 1968. The provisions of Policy 13–69 for qualification by achieving a score on the GRE Advanced Tests are not meaningful alternatives to provisions for qualification by achieving a score of 640 or 750 on the GRE Aptitude Test. Superintendent Buchanan conceded that the GRE Advanced Test cutoff points are "too high".

Racial differentials like those above mentioned were expected by defendants when they adopted Policy 13–69. Superintendent Buchanan, who was in office at that time and who was responsible for framing the policy, stated that it would be "naive" to say that the Board was not thinking about black teachers teaching white students when it considered Policy 13–69. He further testified that he "expected" Negroes to score more poorly than whites. Policy 13–69 will continue to disqualify substantially more black teacher applicants than white applicants for the next few years.

Some good teachers have been barred by Policy 13–69. Eight teachers who were disqualified on the basis of their GRE scores were recommended by their principals for reemployment during the 1970–71 school year. Three additional teachers were "highly recommended" by their principals, but they failed to meet the GRE cutoff score. One other teacher was recommended as being an "extremely good teacher", another was recommended as a "talented art teacher"; and still another was recommended as the "best P.E. teacher for girls with whom I have had experience by far". Thus, at least 14 of the 25 teachers barred by Policy 13–69 were recommended for reemployment on the basis of their past performance. These recommendations were made by their principals, the key officials in past rehiring decisions.

The plaintiffs in Count I of this action have had from one to twenty-eight years of teaching experience in the Starkville Schools. Prior to the adoption of Policy 13–69, the school authorities found them to be satisfactory for reemployment in the system. The application of Policy 13–69 prevented their reemployment for the 1970–71 school year.

The reassignment and transfer provision of Policy 13–69 will act to impede faculty desegregation in the school district. The provision provides that upon recommendation of the Superintendent of Schools, currently employed staff members may be elected for the ensuing year by the Board of Trustees and reassigned to the school in which the staff member is employed. It is further provided, however, that a currently employed person who has been recommended for reemployment for the ensuing contract period who wishes to apply for transfer to a position in another school shall be given prior consideration over new candidates for election, provided a written application is filed, and the employed person will have had three or more years experience in the Starkville Schools with at least one year of satisfactory service in a position similar to that for which application for transfer is made. In order for a person to be eligible to transfer, the staff member must meet the requirement of the 640 point minimum on the GRE or rank on or above the 50th percentile in education or the specific subject matter field on the advanced section of the GRE.

In light of all the facts and circumstances surrounding the defendant School District, at the time of implementation of Policy 13–69, the court concludes that the School Board, in adopting the policy, knew or should have known that its implementation would bar more black than white teachers from reemployment and hiring by the district. It is, of course, commendable that the district seeks reasonable means to improve the quality of teachers employed to teach

the children, black and white, in attendance at its school and the courts should not interfere, as long as the means adopted are not discriminatory. The application of this policy, however, has acted to bar proportionately more black teachers than white teachers for reemployment and hiring in the Starkville Schools.

### Recruiting for Black Teachers

Defendants actively solicited black students in various universities and colleges for a position as principal and positions as teachers in the Starkville School District. The solicitation letter to the placement offices set out the minimum standards of Policy 13–69. That policy is so stringent that the solicitation letter would discourage most black applicants who are attending college because they would not yet have a Master's Degree and 83 percent of them would not have a score of 750 on the GRE Aptitude Test.

## CONCLUSION

■ This court has jurisdiction of this action pursuant to 28 U.S.C. § 1343; and plaintiffs have standing to sue. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970); Smith v. Board of Education of Morrilton School District No. 32, 365 F.2d 770 (8th Cir. 1966); Alston v. School Board of City of Norfolk, 112 F. 2d 992 (4th Cir. 1940).

■ It is unconstitutional for public officials to discriminate on the basis of race in hiring and retention of teachers in the public schools. Singleton v. Jackson Municipal Separate School District, *supra*, 419 F.2d at 1218; Chambers v. Hendersonville City Board of Education, 364 F.2d 189, 192 (4th Cir. 1966) (*en banc*).

In cases where discrimination is an issue, "statistics often tell much, and Courts listen." Alabama v. United States, 304 F.2d 583, 586 (5th Cir. 1962), aff'd, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d

112 (1962); *Accord,* Turner v. Fouche, 396 U.S. 346, 360, 90 S.Ct. 532, 24 L.Ed. 2d 657 (1970); United States v. Board of Education of City of Bessemer, 396 F.2d 44, 46 (5th Cir. 1968); Hawkins v. Town of Shaw, 437 F.2d 1286 (5th Cir., dated January 28, 1971).

■ Defendants' actions brought about for the academic year 1970–71 a disproportionate increase in the percentage of white teachers and principals from 70 percent to 78 percent while the percentage of black students increased from 47 percent to 50 percent. A wide disparity in the ratio of black to white faculty as compared to the ratio of black to white students constitutes substantial evidence of the presence of racial discrimination. Jackson v. Wheatley School District No. 28, of St. Francis County, Ark., 430 F.2d 1359, 1363 (8 Cir. 1970); see Penn v. Stumpf, 308 F.Supp. 1238, 1243 (N.D.Cal.1970).

In the action sub judice there has been a long history of racial discrimination by defendants in the conduct of the Starkville Public School System. The School Board continued to operate a dual system of schools based upon race long after Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and failed to commence conversion to a unitary system until forced to do so by the order of this court on February 5, 1970. Montgomery v. Starkville Municipal Separate School District, *supra*. In converting from a dual to a unitary system, defendants denied reemployment to a disproportionately large number of black teachers as compared to the number of whites denied reemployment. A "long history of racial discrimination, coupled with disproportionate discharges in the ranks of Negro teachers where desegregation finally is begun, gives rise to a rather strong inference of discrimination * * *." Williams v. Kimbrough, 295 F.Supp. 578, 585 (D. La.1969). See Chambers v. Hendersonville City Bd. of Educ., *supra*; Jackson v. Wheatley School District No. 28, *supra*.

The inference of racial discrimination arising from the circumstances of this case "thrust[s] upon the School Board the burden of justifying its conduct by clear and convincing evidence." Chambers v. Hendersonville City Bd. of Educ., supra, 364 F.2d at 192.

■ Defendants have not shown by "clear and convincing evidence" that their failure to rehire black teachers and to hire black applicants was not racially discriminatory. Williams v. Kimbrough, supra; Chambers v. Hendersonville City Bd. of Educ., supra.

The 640 and 750 cutoff scores established by defendants on the GRE Aptitude Test create a racial classification. They include, respectively, 91 and 77 percent of the white graduates of Mississippi schools within the group eligible for reemployment and hiring in the public schools and exclude from this group, respectively, 64 and 83 percent of the black graduates of Mississippi schools. Arrington v. Massachuetts Bay Transportation Auth., 306 F.Supp. 1355, 1358 (D.Mass.1969). See also, e. g., Gomillion v. Lightfoot, 364 U.S. 339, 347, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); Smith v. Texas, 311 U.S. 128, 131, 61 S.Ct. 164, 85 L.Ed. 84 (1940).

Because the GRE, as used, classifies applicants and in-service teachers on the basis of race, the defendants must show an "overriding purpose independent of invidious racial discrimination which justifies this classification." Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967). See also, McLaughlin v. State of Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964).

■ Defendants have not discharged their "very heavy burden of justification" in this regard, Loving v. Virginia, supra, 388 U.S. at 9, 87 S.Ct. 1817, and the court, therefore, concludes that Policy 13–69 is an unconstitutional racial classification.

A standardized test such as the GRE may lawfullly be used in selecting persons for employment opportunities only if it "fairly measures the knowledge of skills required by the particular job or class of jobs which the applicant seeks, or which fairly affords the employer a chance to measure the applicant's ability to perform a particular job or class of jobs." Equal Employment Opportunity Commission (EEOC), Guidelines on Employment Testing Procedures, CCH Employment Practices Guide, Para. 16,904 (August 24, 1966). Accord, United States, by Clark v. H. K. Porter Co., 296 F.Supp. 40, 78 (N.D.Ala.S.D.1968); United States v. Sheet Metal Workers, etc., Local Union No. 36, 416 F.2d 123, 136 (8th Cir. 1969); Griggs v. Duke Power Company, 420 F.2d 1225, 1235 n. 8 (4th Cir. 1970), rev'd. 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (March 8, 1971).

■ The court concludes that, apart from its discriminatory aspects, Policy 13–69 and particularly the cutoff scores on the GRE established in that policy are arbitrary and unreasonable qualifications for employment as a teacher in the Starkville system and therefore violate the Due Process Clause.

■ It is both unreasonable and discriminatory to use ostensibly neutral criteria for employment where those criteria are not substantially related to the job's requirements and where the criteria disqualify substantially more black applicants than white applicants. Arrington v. Massachusetts Bay Transportation Authority, supra; Penn v. Stumpf, supra. Accordingly, the court concludes that defendants' use of the GRE violates the Due Process and Equal Protection Clauses of the fourteenth amendment because the examinations are not job related to the extent that they determine teacher competency, because, as used, they disqualify a disproportionate number of black teachers and applicants.

■ During the transition from a dual to a unitary system, a school board has an obligation to maintain the "system-wide racial ratio" of its faculty. Carter v. West Feliciana Parish School

Board, 432 F.2d 875, 878, 879 (5th Cir. 1970). The *Singleton* decree prohibits schools boards in the process of transition from a dual system to a unitary system from reducing the number of teachers in the system and then filling those or other vacancies with persons of a different race unless the board first offers the vacancies to the displaced staff members. Singleton v. Jackson Municipal Separate School District, *supra*. Defendants have violated this prohibition by failing to offer vacancies to black applicants or to those black teachers who have been displaced.

The court finds that the adoption and implementation of Policy 13–69 by defendant School Board discriminates against the reemployment and hiring of Negro teachers in the Starkville School System, and infringes upon the constitutionally protected rights of the plaintiffs in Count I of this action.

Plaintiffs are entitled to the relief as follows:

1) Policy 13–69 will be declared unlawful and defendants will be enjoined from utilizing the Graduate Record Examinations in the selection of in-service teachers for reemployment and in the hiring of new teachers.

2) Plaintiff teachers who were not reemployed by defendants for the 1970–71 academic year pursuant to the preliminary injunction of this court dated September 5, 1970, are entitled to recover provable damages including, but not limited to, loss of salary, salary differences, and moving and transportation expenses. Wall v. Stanley County Board, 378 F.2d 275, 276 (4th Cir. 1967) (*en banc*). In addition, all plaintiff teachers are entitled to reinstatement. Those plaintiff teachers employed elsewhere during the 1970–71 school year are entitled to reinstatement for the 1971–72 school year and any reasonable expenses in returning to Starkville to assume teaching positions. Williams v. Kimbrough, 295 F.Supp. at 578, 586 (W.D. La.1969).

3) Defendants will be required to:

a) Fill vacancies occurring during the academic year 1970–71 with black teachers and shall hire as many black teachers for the academic year 1971–72 as may be necessary to attain the racial ratio existing on the faculty during 1969–70 school year.

b) Notify all in-service teachers who, for any reason were not employed for the 1970–71 school year; that Policy 13–69 has been declared unlawful and that, except as necessary to comply with the requirements on Paragraph 3(a) hereof, the school system, in filling vacancies, will give first priority to applications made by teachers who were present in the system during the 1969–70 academic year. The notices as required by this paragraph shall include a copy of the court's order.

c) Notify all persons who filed applications to teach during the 1970–71 academic year that Policy 13–69 has been declared unlawful and that the school system invites them to renew their application. The notices as required by this paragraph shall include a copy of the court's order.

d) Notify all college and university officials who were contacted as a part of the 1969–70 recruitment campaign that Policy 13–69 has been declared unlawful and that neither a Master's Degree nor a satisfactory score on the GRE is a precondition to employment in the Starkville Public Schools. The notices required by this paragraph shall include a copy of the court's order.

e) At least 30 days in advance of any change in the policies, procedures, standards or practices for selection of in-service teachers for reemployment or for the hiring of new teachers which were in effect on September 1, 1970, the defendants shall file with this court and serve on counsel for plaintiffs written notice of the proposed change along with the statement for the reasons therefor.

f) File on or before June 15, 1971 with this court and serve on counsel

for plaintiffs a report in writing of the number of teachers and the number of principals, by race, hired for the academic year 1971–72; of the number of those teachers and principals, by race, who were employed by defendants during the 1970–71 academic year; and of the number of additional teachers and principals, by race, anticipated to be hired for the 1971–72 academic year; and on October 1, 1971 file with this court and serve on counsel for plaintiff a written report of the number of teachers and principals, by race, actually employed in the school system for the 1971–72 academic year and those, by race, who were employed during 1970–71.

Counsel for plaintiffs shall present to the court within fifteen days a suitable and appropriate order to be entered in this action. Before submitting the order, counsel shall secure approval thereof, as to form only, by counsel for defendants.