July 20, 1978

## 78-41 MEMORANDUM OPINION FOR THE COUNSEL TO THE ASSOCIATE ATTORNEY GENERAL, ATTORNEY PERSONNEL

### Employee Selection Procedures—Use of LSAT Scores in the Department's Honor and Summer Intern Programs

This responds to your predecessor's request for our opinion whether the Department may consider Law School Admission Test (LSAT) scores of applicants for the Honor and Summer Intern Programs. For the reasons that follow we recommend against such use.

In a memorandum from your predecessor to the Civil Rights Division, he explained how the Department uses and considers LSAT scores in these programs. The score, he maintains, is only a minor factor in the evaluation of program applicants. He also states that the score is considered a "rough indication of intellectual ability."

The use of tests and test scores for employment purposes is a major subject in employment-discrimination law. The Supreme Court in *Griggs* v. *Duke Power Co.*, 401 U.S. 424 (1971), established the basic standards by which employee selection devices, including tests, were to be judged to determine whether they illegally furthered discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The Court held that employment practices that operate to exclude protected class members under Title VII[1] and that cannot be shown to be related to job performance are prohibited. *Id.*, at 431. If a practice operates disproportionately to exclude minorities, the employer must meet the heavy burden of proving that the practice "bear[s] a demonstrable relationship to successful performance of the jobs for which it is used." *Id.* The Equal Employment Opportunity Commission (EEOC) has published "Guidelines on Employee Selection Procedures." 29 CFR § 1607.1

---

[1] Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). Because our discussion relates to tests as employment devices and because racial minorities generally do not perform as well as the rest of the population on written tests our focus will be on how the Department's use of the LSAT affects racial minorities.

*et seq.*[2] One of the concerns which led to the publication of these guidelines is the common practice of "using tests as the basis for employment decisions without evidence that they are valid predictors of employee job performance." 29 CFR § 1607.1(b). Where such evidence is lacking "the possibility of discrimination in the application of test results must be recognized." Section 1607.3 of the guidelines, in defining discrimination, essentially restates the *Griggs* standard. It provides, in pertinent part, that the use of a test that disproportionately rejects minorities in the hiring process constitutes discrimination unless the test is predictive of, or significantly correlated with, actual job requirements. Even where the test is reasonably related to job requirements, if it disproportionately rejects minorities the employer must show that there is no suitable alternative hiring procedure that would impact less heavily on minorities. *Id.*

We now turn to the Department's use of LSAT scores to see whether its procedure comports with the above rules. The memorandum from your Office explains the Department's use of these scores as follows. The Department operates on the premise that the LSAT score is a rough indicator of intellectual ability. Proceeding from this premise it explains the significance that the Department attaches to these scores:

> In order to evaluate the non-intellectual abilities of the candidate the LSAT score is compared to the applicant's academic record. If a person has a high LSAT score, but only average grades then it suggests that the person is an underachiever and we are therefore not interested in him. By the same token, a mediocre or low LSAT score coupled with high academic performance suggests that the candidate is a hard worker and self disciplined. The person did not achieve his excellent grades by intellectual ability alone. This weighs very heavily in the candidate's favor. Finally, a high LSAT score and high academic performance suggests that not only is the person very bright but he or she is also a hard worker.

This explanation may be illustrated by the following categorization of applicants:

    (1) high grades—high LSAT
    (2) high grades—average LSAT
    (3) average grades—average LSAT[3]
    (4) average grades—high LSAT

---

[2]These guidelines are entitled to great deference and have been followed by virtually every court dealing with these issues. *See. Douglas* v. *Hampton*, 512 F. (2d) 976, 986 (D.C. Cir. 1975), and cases cited. *See also. Washington* v. *Davis*, 426 U.S. 229, 247, n. 13 (1976).

[3]Although the memorandum does not state how this combination of grades and LSAT scores bears upon the employment decision, this category of applicants seems logically to fall between classes 2 and 4. Class 4 members are unfavorably viewed as "underachievers." That label would not fit class 3 members since their grades are commensurate with their LSAT scores. Thus, class 3 members would appear to be considered more desirable applicants than those in class 4. Class 3 members, however, are not viewed as favorably as class 2 members. Class 2 members are seen as hard working and self-disciplined. It would seem to follow that class 3 members do not warrant these labels because their grades were consistent with their LSAT scores.

We have listed the categories in the order of the most desirable applicants (class 1) to the least desirable applicants (class 4); desirability is based on the reasoning of the above quoted statement.

At this point it is important to keep in mind that the use of test scores where the test is not predictive of or correlated with job performance is a discriminatory practice only insofar as it operates to reject disproportionate numbers of protected class members. Therefore, we must consider the adverse impact that use of LSAT scores has on minority applicants. To proceed with our analysis we make two basic assumptions to determine whether there is a possible adverse effect on minority applicants. First, we assume that minority members as a general rule do not perform as well as nonminority persons on the LSAT. Second, we assume that minority members as a general rule receive lower law school grades than nonminority persons.[4]

Accepting these assumptions as valid, we can now evaluate how the Department's use of LSAT scores may affect minority applicants in the Honor and Summer Intern Programs.

## I. Class 1 (high grades—high LSAT)

Class 1 would include very few minority members because the high grades and high LSAT score are inconsistent with assumed minority performance. Therefore, this class would, to a large degree, be composed of whites. A high LSAT score adds to their desirability since the Department would view an individual in this class as very bright and hard working. Thus, in this class the LSAT is considered as a positive factor. The effect of this is to give these predominantly white applicants an additional advantage based on their LSAT scores. Members of the other classes are adversely affected by this because the effect of increasing the ratings for class 1 members serves to make members of the other classes less desirable comparatively.

## II. Class 2 (high grades—average LSAT)

Because of their high grades, members of this class would also be predominantly white. Interestingly, here the average LSAT would actually be considered favorably. The theory is that the class member received grades higher than expected. Thus, in this case, an average LSAT score is a positive factor. Although it seems anomalous, this favorable consideration of average LSAT scores adversely affects minority members. Most minorities would not

---

[4]Unfortunately, we do not have ready access to the actual statistics on this subject, if indeed any exist. However, we believe that these assumptions are fully warranted since there is a "substantial body of evidence that black persons and other disadvantaged groups perform on the average far below the norm for whites on generalized intelligence or aptitude tests." *Douglas* v. *Hampton*, 512 F. (2d) 976, 983, quoting from *Arrington* v. *Massachusetts Bay Transp. Auth.*, 306 F. Supp. 1355, 1358 (D. Mass. 1969). The LSAT concededly is a general intelligence test. Therefore minorities would not be expected to score as high as whites. *See also, Racial Bias and the LSAT: A New Approach to the Defense of Preferential Admissions,* 24 Buff. L. Rev. 439, 456 (1974), and Bell, *In Defense of Minority Admissions Programs: A Response to Professor Graglia,* 119 U. Penn. L. Rev. 364, 367 (1970).

receive the benefits connected with average LSAT scores because, not having received high grades, they would not be in this class. Thus, here again, it is fair to assume that whites would, to a disproportionate degree, benefit from the use of LSAT scores.

### III. Class 3 (average grades—average LSAT)

Most black applicants would fall in this class. Consideration of the LSAT scores would result in no discernible advantage to blacks based upon the reasoning of the memorandum.

### IV. Class 4 (average grades—high LSAT)

This is the one class where LSAT would adversely impact on predominantly white class members. The high LSAT would result in fewer black class members. The negative inferences drawn from the average grades—high LSAT combination would diminish employment opportunities for these applicants.

As the foregoing illustrations demonstrate, it is quite possible that the Department's use of LSAT scores may work to the disadvantage of minorities. Accurate data on the Department's use of these scores would be required before we could say, with any assurance, that this possible adverse impact is consistent with what actually occurs. However, it is surely a possibility.

Proceeding under the premise that the Department's use of the LSAT has a possible discriminatory impact, the issue becomes whether such use is reasonably predictive of job performance. The Educational Testing Service (ETS) prepares the LSAT. This organization has consistently warned against use of the LSAT in employment decisions since it is of doubtful validity as a predictor of success in practice. Your memorandum states that the Department's primary use of LSAT scores is to measure motivation. That is, the test results are used to see how an individual's grades stack up against his or her LSAT rating. The validity of the Department's assumption regarding applicant motivation has not been established. The EEOC guidelines state that:

> Evidence of a test's validity should consist of empirical data demonstrating that the test is predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated. 28 CFR § 1607.4(c).

It thus seems that the Department is obliged to determine whether its assumptions on applicant motivation are empirically supportable.

Congress, in passing the 1972 amendments to Title VII, Pub. L. 92-261, 86 Stat. 103, extended the protections of Title VII to Federal employees. Their legislative history shows that the Federal Government's use of unvalidated hiring criteria was a major concern to the Congress.

> Civil Service selection and promotion requirements are replete with artificial selection and promotion requirements that place a premium on "paper" credentials which frequently prove of questionable value as a means of predicting actual job performance. *The problem is*

*further aggravated by the* [Civil Service Commission's] *use of general ability tests which are not aimed at any direct relationship to specific jobs.* The inevitable consequence of this, as demonstrated by similar practices in the private sector, and found unlawful by the Supreme Court, is that classes of persons who are culturally or educationally disadvantaged are subjected to a heavier burden in seeking employment. [Emphasis added.][5]

Congress decried the use of such hiring criteria, stating that the "inevitable consequence" of this is to create an added and unwarranted burden on disadvantaged classes. The D.C. Court of Appeals in *Douglas* v. *Hampton,* 512 F. (2d) 976 (D.C. Cir. 1976), likewise condemned the use of unvalidated hiring criteria in holding that Federal employment tests must rationally measure required job skills. *Cf., Washington* v. *Davis,* 426 U.S. 229, 247, n. 13 and accompanying text (1976).

Private employers covered by title VII are required to use validated selection criteria. It would be anomalous for the Federal Government not to meet this same requirement. The United States Commission on Civil Rights in a July 1975 report, *The Federal Civil Rights Enforcement Effort—1974, Vol. V.—To Eliminate Employment Discrimination,* stated:

The Federal Government must not be permitted the continued use of employment selection standards which close the doors to groups victimized by years of discrimination without any empirical proof of such standards' relation to job performance; to do so, would permit the Government to escape adherence to the requirements it, itself, imposes on private employers. Such policy decisions within the Government seriously erode the Government's own credibility as an enforcer of the law [footnotes omitted]. *Id.,* at 42-43.

We are not unsympathetic with the unique problems involved in formulating accurate predictors of attorney job performance. Nor do we fail to recognize that other employment criteria for attorneys are not purely objective. Law school grades[6] and employment interviews are not validated as predictors, and we do not here address the question whether they should be. We agree, however, with the Civil Rights Division's view insofar as it maintains that:

In light of the difficulty in evaluating job performance, we are forced to use imprecise indicators of ability. Where, however, as here, we have reason to question the usefulness of an indicator, we believe it should be eliminated as a criterion of selection, particularly in light of the appearance it creates of the application of a lesser standard of compliance with Title VII in Department hiring than in hiring by other employers.

---

[5]H. Rept. No. 238, 92d Cong., 1st sess. 24 (1971), 1972 U.S. Code Cong. Admin. News, 2159.

[6]Grades in law schools are more reliable indicators than are LSAT scores, in that grades are given on the basis of legal work performed or questions answered. Therefore, a student is graded for activities similar in many respects to work he or she will do in practicing law.

Your memorandum states that the Department is not insensitive to the possibility of the LSAT being tainted by cultural biases. It is because of this concern, it maintains, that the LSAT score plays a less significant role in evaluating minority candidates. While this may be true, it fails to deal with the possibility of nonminority candidates' ratings being augmented because of LSAT considerations. This would have the same effect as penalizing minority candidates for their performance on the LSAT because even though they might not be negatively considered as a result of their scores, their ratings would be comparatively lower because of LSAT consideration.

A second and possibly more important issue is this. If a selection procedure impacts adversely on minorities as a result of a discriminatory practice, the degree of discrimination is irrelevant. *See, Bolton* v. *Murray Envelope Corp.*, 493 F. (2d) 191 (5th Cir. 1974); *Rowe* v. *General Motors Corp.*, 457 F. (2d) 348 (5th Cir. 1972). While we concede it to be far from clear that the Department's use of LSAT scores to measure motivation results in a disproportionate rejection of minority applicants, a plausible case can be made that this in fact occurs. In sum, we recommend that the Department abandon the policy of considering LSAT scores to determine employee motivation because of the procedure's (1) questionable reliability, (2) uncertain legality, and (3) apparent conflict with requirements of private employers.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*