Percy H. GREEN, Plaintiff-Appellant,

v.

McDONNELL DOUGLAS CORPORA-
TION, Defendant-Appellee.

No. 20596.

United States Court of Appeals,
Eighth Circuit.

March 30, 1972.

Rehearing and Rehearing En Banc
Denied May 12, 1972.

Rehearing Denied June 28, 1972.

Louis Gilden, St. Louis, Mo., for plaintiff-appellant.

Gaylord C. Burke, Thomas C. Walsh, St. Louis, Mo., for defendant-appellee; Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., of counsel.

Jack Greenberg, James M. Nabrit, III, Norman C. Amaker, William L. Robinson, New York City, for amicus curiae NAACP Legal Defense and Educational Fund, Inc.

Before JOHNSEN, LAY and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

Percy Green, a black citizen, brought this action against McDonnell-Douglas Corporation (McDonnell) under Title VII[1] of the Civil Rights Act of 1964, seeking relief from the latter's allegedly discriminatory conduct in denying Green employment in July 1965. Green also pressed a claim that McDonnell had discharged him from a job in August 1964 for reasons of race in violation of 42 U.S.C. § 1981. The district court denied Green any relief. Green v. McDonnell-Douglas Corporation, 318 F.Supp. 846 (E.D.Mo.1970). Green prosecutes this timely appeal. For the reasons stated below, we reverse and remand this case for further proceedings.

To place this controversy in an appropriate frame of reference, we find it necessary to examine chronologically both the underlying facts and the procedures followed in the district court. Although the immediate controversy springs from the refusal of McDonnell to employ Green on July 26, 1965, its origin lies in an earlier employment relationship. In

---

1. 42 U.S.C. § 2000e et seq.

1956, McDonnell employed Green as a mechanic. He remained with the company continuously, except for twenty-one months of honorable military service, until he was laid off on August 28, 1964. Initially, Green's job was protected by union security, but in 1963 he transferred to a non-union position as a laboratory technician, performing work on research projects in the Electronic Equipment Division of McDonnell. In 1964, the workload decreased in the Electronic Equipment Division, and the company laid off several persons, including Green.

Green, a long-time activist in the movement to obtain equal rights for black citizens, vigorously protested his discharge as being racially motivated. He also filed formal complaints of discrimination with the President's Commission on Civil Rights, the Justice Department, the Department of the Navy, the Defense Department, and the Missouri Commission on Human Rights. As a member of CORE, and later as a member of ACTION, another civil rights organization, Green, in late 1964 and during 1965, participated in several demonstrations which were staged to call attention to McDonnell's allegedly discriminatory employment practices. These demonstrations included picketing the home of James F. McDonnell, Chairman of the Board of McDonnell; blocking a main highway access route leading to the McDonnell plant during a traffic "stall-in"; and, participating in a civil rights demonstration during which the doors of a downtown St. Louis building which housed certain McDonnell employees were locked with chains by some of the demonstrators.

On July 25, 1965, McDonnell ran an advertisement in the St. Louis, Missouri, newspapers seeking qualified electrical mechanics. The next day Green applied for one of these positions, but McDonnell, although still seeking qualifed mechanics, refused to hire him. McDonnell never has disputed Green's technical ability to perform the work required in that position. Thereafter, on September 14, 1965, Green filed a formal complaint with the Equal Employment Opportunity Commission (EEOC), alleging that McDonnell had discriminated against him "because of [his] race and because of [his] persistent involvement in the Civil Rights Movement." On May 8, 1967, the EEOC determined that reasonable cause existed to believe that McDonnell had violated 42 U.S.C. § 2000e–3(a) by refusing to employ Green "because of his involvement in civil rights activities." [2] It made no determination on the allegation of racial bias.

The EEOC unsuccessfully attempted to conciliate the dispute. Accordingly, on March 19, 1968, it issued a thirty-day letter notifying Green that he might institute civil action in federal court pursuant to 42 U.S.C. § 2000e–5(e). This litigation followed.

In a complaint filed April 15, 1968, Green alleged that McDonnell had discriminated against him by denying him employment "because of his involvement in civil rights activities." On March 20, 1969, Green filed an amended complaint alleging that McDonald also had discriminated against him by denying him employment "because of his race and color." Upon motion of McDonnell, the district court struck this additional claim on the ground that the EEOC had made no finding as to reasonable cause on this claim. Green v. McDonnell-Douglas Corp., 299 F.Supp. 1100 (E.D.Mo.1969).

Although 42 U.S.C. § 1981 [3] was not specifically mentioned in any of the pleadings, Green, during trial and in

---

2. The EEOC abstained from taking action in deference to the Missouri Commission on Human Rights, see 42 U.S.C. § 2000e–5(c), until February 4, 1966, when Green requested the EEOC to assert jurisdiction.

3. Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full

post-trial briefs, construed the pleadings to assert that his 1964 layoff was motivated by racial prejudice in violation of that statute.

The district court rejected Green's claim that McDonnell denied him employment in 1965 because of his participation in protected civil rights activities. The court also rejected the 1964 layoff claim brought under § 1981. It summarized its conclusions as follows:

(a) Plaintiff has not shown that defendant was motivated by racial prejudice or because of plaintiff's legitimate civil rights activities.

(b) Plaintiff's layoff claim under 42 U.S.C. § 1981 is barred by the statute of limitations.

(c) The Civil Rights Act does not protect activity which blocks entrance into or from an employer's plant or office.

(d) Defendant's refusal to reemploy plaintiff was based on plaintiff's misconduct, which justified the refusal to rehire. [318 F.Supp. 851]

On this appeal, Green raises the following contentions:

(1) The trial court erred in dismissing his claim under 42 U.S.C. § 1981 for relief from his allegedly unlawful layoff.

(2) The trial court erred in determining that his participation in the "lock-in" and "stall-in" demonstrations did not fall within the protection of 42 U.S.C. § 2000e–3(a).

(3) The trial court erred in striking the allegations of the complaint which charged McDonnell with denying him employment for reasons of race.

### I.

■ We turn first to the issues relating to the 1964 layoff. Several circuits, following the rationale of Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), have concluded that 42 U.S.C. § 1981 affords a remedy in federal court for private discrimination in employment. Young v. International Telephone & Telegraph Co., 438 F.2d 757 (3d Cir. 1971); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971); Waters v. Wisconsin Steel Works of International Harvester Co., 427 F.2d 476 (7th Cir.), cert. denied, United Order of American Bricklayers and Stone Masons Local 21, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970). This court has not yet passed upon this question. We find it unnecessary to do so here since, even if we assume that such an action will lie, the action in this case would be barred by the applicable statute of limitations.

■ Although § 1981 contains no limitation period, an action for deprivation of civil rights brought under a federal statute such as § 1981 is governed by the most analogous state statute of limitations. *See* Glassco v. Howell, 431 F.2d 863, 864 (8th Cir. 1970); Waters v. Wisconsin Steel Works of International Harvester Co., *supra*, 427 F.2d at 488. In this case, the parties agree that Missouri's five-year limitation period for contracts[4] is the most analogous period of limitation. Within that limitation period, Green filed no pleading which mentioned either the 1964 layoff or 42 U.S.C. § 1981.

On August 24, 1970, several months after the trial court had heard the evidence, and more than five years after the 1964 layoff, Green moved under Fed. R.Civ.P. 15(b) to amend his complaint to charge discrimination in "violation of 42 U.S.C. § 1981 in that it was based on race, color, and civil rights activities." The trial court denied leave to amend. The record discloses that McDonnell did not expressly or impliedly consent to any

and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

4. Mo.Ann.Stat. § 516.120(1) (1952).

action under § 1981, and that any evidence relating to the 1964 lay off was introduced as a background for Green's claim to relief from McDonnell's refusal to hire him in July 1965.

Green contends that his amended complaint, which was filed within the limitation period, should be construed to state a claim under § 1981 for discrimination in the 1964 layoff. We cannot accept his broad reading of the language contained in the amended complaint. Although that complaint alleges discrimination "because of . . . race and color," it specifically refers to unlawful employment practices occurring on "July 26, 1965, and thereafter." This language convinces us that the amended complaint was not intended to encompass the 1964 layoff. Accordingly, we conclude that the district court properly dismissed the layoff claim.

## II.

We now examine Green's contention that the district court erred in ruling that his participation in the "stall-in" and "lock-in" demonstrations did not fall within the protection of 42 U.S.C. § 2000e–3(a). We confine our discussion here to the question whether Green's participation in the "stall-in" is a protected activity under § 2000e–3(a). The record does not support the trial court's conclusion that Green "actively cooperated" in chaining the doors of the downtown St. Louis building during the "lock-in" demonstration. *See* Judge Lay's concurring opinion, *infra.* We therefore measure the protection afforded by § 2000e–3(a) against Green's admitted participation in the "stall-in."

Section 2000e–3(a), as pertinent, reads:

It shall be an unlawful employment practice for an employer to discrimin-

ate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

In support of his protection argument, Green stresses the language forbidding discrimination "because [an applicant] has opposed any practice made an unlawful employment practice by this subchapter." According to Green, since the "stall-in" was a non-violent protest designed to call attention to McDonnell's allegedly discriminatory practices, this activity commands the protection of § 2000e–3(a). McDonnell, on the other hand, asserts that the unlawfulness of this protest removes it from the protection of that section.

■ We find little relevant authority for either position. The legislative history of Title VII provides us with no guidance as to the scope of the protection afforded by § 2000e–3(a), and the small body of case law surrounding that section contains little discussion on the subject.[5] Nevertheless, we think it is clear from the language of the statute that Congress sought to protect employees and job applicants from employer retaliation for filing complaints to the EEOC. Those who have the courage to challenge discriminatory practices of an employer merit that protection. Without doubt, lawful protest also commands the same protection, but we find no suggestion that protection extends to activities which run afoul of the law. Accordingly, we agree with the district court that the "stall-in" demonstration was not a protected activity under § 2000e–3(a).

5. As support for his position, Green cites passages from Pettway v. American Cast Iron Pipe Co., 411 F.2d 998 (5th Cir. 1969). In that case, the Fifth Circuit held that § 2000e–3(a) prohibits an employer from discharging an employee who makes false statements in a complaint to the EEOC. Although the opinion char-

acterized the protection of § 2000e–3(a) as broader than the analogous protection afforded an employee under the Fair Labor Standards Act, 29 U.S.C. § 215(a) (3), and under the National Labor Relations Act, 29 U.S.C. § 158(a) (4), the court did not attempt to define the parameters of § 2000e–3(a).

### III.

We find merit in Green's contention that the district court erred in striking the allegation that McDonnell denied him employment in July 1965 "because of his race and color." Such discriminatory practices are prohibited by 42 U.S.C. § 2000e–2(a) (1), which provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

█ As noted above, the district court struck this allegation on the ground that the EEOC had made no finding of reasonable cause. Although the enforcement provisions of Title VII are silent as to the necessity of such a finding, it is now well settled that a complaining party need satisfy only two jurisdictional prerequisites in order to bring suit against an employer under Title VII: first, he must file a complaint with the EEOC; and second, he must receive the statutory notice of the right to sue. *See* Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971); Beverly v. Lone Star Lead Construction Corp., 437 F.2d 1136 (5th Cir. 1971); Flowers v. Local No. 6, Laborers International Union of North America, 431 F.2d 205 (7th Cir. 1970); Fekete v. U. S. Steel Corp., 424 F.2d 331 (3d Cir. 1970); Culpepper v. Reynolds Metal Co., 421 F.2d 888 (5th Cir. 1970); Miller v. International Paper Co., 408 F.2d 283 (5th Cir. 1969). Moreover, four circuits have squarely held that an EEOC finding of reasonable cause is not a jurisdictional prerequisite to suit. Robinson v. Lorillard Corp., *supra*; Beverly v. Lone Star Lead Construction Corp., *supra*; Flowers v. Local No. 6, Laborers International Union of North America, *supra*; Fekete v. U. S. Steel Corp., *supra*.

█ In this proceeding, Green satisfied the established prerequisites to a Title VII suit. His formal complaint to the EEOC stated that McDonnell had discriminated against him "because of [his] race and because of [his] persistent involvement in the Civil Rights Movement." We hold that Green was entitled to judicial review of all grounds of employment discrimination alleged in his complaint to the EEOC, and that the district court's ruling to the contrary was erroneous.

### IV.

In anticipation of an adverse ruling on this issue, McDonnell argues that Green sustained no prejudice from the trial court's erroneous ruling because the trial court actually considered the racial discrimination claim and ruled against Green on the merits. Therefore, the argument continues, the district court's decision should be affirmed despite this erroneous ruling.

We cannot accept McDonnell's suggestion that it should prevail on an issue that Green was not privileged to present. We cannot say that the district court's action in striking the racial discrimination claim did not hamper the preparation and presentation of Green's case, notwithstanding the commendable zeal displayed by his counsel in producing an abundant record of events and circumstances relating to Green's employment relationship with McDonnell. Additionally, as discussed in part V below, the district court failed to consider whether the reasons given by McDonnell for not rehiring Green were related to the requirements of the job. Instead, the district court simply assumed that, since the "lock-in" and "stall-in" protests were unprotected activities, McDonnell's refusal to rehire Green could not be violative of 42 U.S.C. § 2000e–2(a) (1). The district court said:

It must be remembered that so far as the Civil Rights Act goes, the employer may discharge or refuse to reemploy for any reason, except discrimination or because of practices made

unlawful under Title VII. The testimony and evidence before the court fails to establish by its greater weight, or preponderance, that defendant's refusal to rehire plaintiff resulted from racial prejudice or plaintiff's legitimate civil rights activities. It seems clear from the record that defendant's reasons for refusing to rehire the plaintiff were motivated solely and simply by the plaintiff's participation in the "stall in" and the "lock in" demonstrations. The burden of proving other reasons was on the plaintiff. [318 F.Supp. at 850]

We think it is clear that an applicant for employment may be entitled to the protection of § 2000e–2(a) (1) even though he participates in activities which fall outside the protection of § 2000e–3(a). These statutes apply to wholly different facets of the employment relationship. Section 2000e–3(a) serves peripherally in the scheme of Title VII to shield an employee or applicant from employer retaliation. Section 2000e–2(a) (1) expresses Title VII's primary promise—equal employment opportunities for all. It would be antithetical to the remedial purposes of the Act to interrelate these sections so as to construe the Act to mean that an applicant's civil rights activities which fall outside § 2000e–3(a) may serve as a basis for employment disqualification without consideration of the separate standards called for by § 2000e–2(a) (1).

In the light of this record, we deem it necessary to remand this case to the district court for reconsideration of the racial discrimination issue in accordance with the standards discussed below. On remand, the parties should be permitted to present such additional evidence as may be relevant to the issue.

## V.

The record shows that McDonnell has taken the position that it has the right under Title VII to make subjective hiring judgments which do not necessarily rest upon the ability of the applicant to perform the work required. Upon that hypothesis, and apparently because the pleadings did not require McDonnell to defend the charge that its refusal to rehire Green was racially motivated, McDonnell made little effort to show that Green's participation in the "stall-in" would affect his ability to perform the job or to work harmoniously with other employees and supervisors. We need to evaluate this position in light of our cases dealing with job discrimination based on race.

Our prior decisions make clear that, in cases presenting questions of discriminatory hiring practices, employment decisions based on subjective, rather than objective, criteria carry little weight in rebutting charges of discrimination. *See* Moore v. Board of Education of Chidester School District No. 59, Ark., 448 F.2d 709 (8th Cir. 1971). *See also* Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971). We reaffirm this principle here. "If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In enacting Title VII, Congress has mandated the removal of racial barriers to employment. Judicial acceptance of subjectively based hiring decisions must be limited if Title VII is to be more than an illusory commitment to that end, for subjective criteria may mask aspects of prohibited prejudice. Employers seldom admit racial discrimination. Marquez v. Omaha, Ford Division, 440 F.2d 1157, 1162 (8th Cir. 1971). Its presence is often cloaked in generalities or vague criteria which do not measure an applicant's qualifications in terms of job requirements. Consequently, a black job applicant must usually rest his case of discrimination upon proof that he possessed the requisite qualifications to fill the position which was denied him. In this case, it is undisputed that Green possessed the requisite skills to perform the work for which he applied, and that McDonnell was seeking qualified appli-

cants at the time it refused to hire him and continued to seek qualified applicants thereafter. Moreover, Green's prior performance with McDonnell had earned him a "satisfactory" rating.

When a black man demonstrates that he possesses the qualifications to fill a job opening and that he was denied the job, we think he presents a prima facie case of racial discrimination and that the burden passes to the employer to demonstrate a substantial relationship between the reasons offered for denying employment and the requirements of the job. Here, McDonnell has not demonstrated by any testimony or other evidence that Green's participation in the "stall-in" would impede his ability to perform the job for which he applied. There is no evidence that Green's conduct would cause fellow employees or supervisors to refuse to cooperate with Green, thereby disrupting plant operations.[6]

In this connection, we note that McDonnell employs over thirty thousand men and women at its St. Louis plant. The record demonstrates that few employees were actually affected by the "stall-in." We recognize that an employee's participation in an activity such as a "stall-in" could impede his ability to work harmoniously in surroundings characterized by close personal, or working, relationships among employees or between employees and management. This problem might be present at McDonnell, but the record is bare on this point. This aspect of the case remains for further exploration. On remand, McDonnell will have the opportunity to present evidence on this matter.

We do not, as does the dissent, construe this remand as a command to Mc-Donnell to rehire Green. The remand is required because the district court did not use the correct standard in determining whether McDonnell's refusal to rehire Green was racially motivated. If McDonnell can demonstrate that Green's participation in the "stall-in" in some objective way reflects adversely upon job performance, McDonnell's refusal to rehire Green will be justified. But, if McDonnell's refusal to rehire Green rests upon management's personal dislike for Green or personal distaste for his conduct in the civil rights field, Green is entitled to some relief.[7]

The amount of lost earnings claimed by Green is not great, see note 8, supra, but the parties regard this as an important case and have devoted substantial time and energy to its litigation. Although the litigation is still not completed, we deem it appropriate to allow appellant a reasonable attorney's fee for this appeal, to be taxed as costs, upon counsel's submission of an estimate of his fee containing details of his services and time spent on this appeal. See 42 U.S.C. § 2000e–5 (k).

LAY, Circuit Judge (concurring).

I join in the reversal and remand. I do so for the reasons stated by Judge Bright and some others as well.

The court's order refusing plaintiff leave to amend his complaint and utilize discovery on the issue of racial discrimination because the E.E.O.C. had not based its finding of probable cause on this ground is conceded error. Argument is made that nevertheless the issue was tried by consent and that the trial judge found there was insufficient evidence to support plaintiff's claim. The ancient Hebrew expression, "They tie

---

6. We note also that the reasons advanced by McDonnell for refusing to rehire Green may be found to be pretextual, particularly since McDonnell advanced the unsupported charge that Green had "actively cooperated" in the "lock-in." See Judge Lay's concurring opinion, infra.

7. The record shows that Green obtained reasonably equivalent employment subse-

quent to July 26, 1965, the date when McDonnell refused to rehire him. Under these circumstances, the district court may limit relief, if any is to be given, to damages based on Green's loss of earnings between July 26, 1965, and the date on which he acquired reasonably equivalent employment, which loss Green estimated to be between four and five thousand dollars.

our hands and then reproach us that we do not use them," gives sufficient response here.

Trial counsel who is foreclosed from pleading and pursuing discovery of facts relating to a particular legal theory is scarcely prepared to try the case on that theory. It is not realistic to urge that thereafter where facts pertaining to that theory are drawn into the case, the issue has been tried by consent and the party has no cause for complaint. If the adversary system means anything at all it is that lawsuits and issues are not designed to be tried by happenchance. To make inquiry as to what additional facts could have been shown is remote to the practicalities of the trial of any lawsuit. Preparation is the guts and heart of effective representation in any litigation. The very contemplation of trying a specific legal issue can trigger mental processes as to strategy in building documentary and testimonial proof of the case. The order of proof, as well as the direct and cross-examination, may well vary as the strategy to present the issues as planned. Without adequate preparation by interviewing the winesses, by discovery of facts unknown, by collation of the facts, by marshalling the documentary evidence, by investigating the law as to the particular issue to be tried, it is little wonder that a trial court dismisses a suit for insufficient evidence. Here, the trial court passed on a claim that it earlier foreclosed from being raised in the pleadings and on which it had refused discovery. For the above stated reasons that finding must be reversed.

Turning to the issues tried, the record presents no evidence whatsoever that the plaintiff actively and illegally participated in the so-called "lock-in." Yet the company used this reason to support their rejection of Green as an employee. I deem this reason pretextual.

The record shows that one of the grounds stated by Mr. Windsor, defendant's Director of Personnel Services, for the refusal to hire Green was because he had "chained the doors of the Roberts Building." There is no evidence which supports this charge. On the day of the lock-in Green was engaged in protected picketing activities. He was told by one member of the picketing group that someone was going to chain the doors of the Roberts Building. When Green arrived at the scene, the chain had either already been removed or officials were in the process of removing it. A complete stranger to this litigation did the chaining. Evidence of mere subjective approval of this incident at the time of trial is not proof of Green's direction or authorization of it. Only if it could be shown that a principal-agent relationship existed between Green and the active participants can their wrongdoing be imputed to him. Cf. International Ladies Garment Workers Union A.F.L. v. N.L.R.B., 99 U.S.App.D.C. 64, 237 F.2d 545 (1956). Since the company erroneously imputed the wrongdoing to Green, it would be compounding the error to allow the company to use these facts as a basis for refusal to hire. Thus the district court's reliance on this fact is clearly erroneous.

The trial court held that the "stall-in" and "lock-in" were "unprotected" activities on which the company based its refusal to hire. The trial court's opinion gives little analysis as to why these reasons were singled out to be the sole cause when the record is undisputed that the company was disturbed over Green's lawful picketing activities as well. These activities were cited by company officials to the E.E.O.C. as part of their motive for refusing to rehire Green as an employee. One has grave difficulty in coming away from analysis of the present record without the belief that the company's rejection of Green was based not so much on an isolated illegal protest but on Green's prolonged activity in bringing public attention to the company's alleged discriminatory practices. Blind acceptance of any non-discriminatory reason offered by an employer in a fair employment case would always preclude correction of any discriminatory practices otherwise existing. It has generally been said that an employer may

refuse to hire or decide to fire any employee for any reason he chooses. Civil rights legislation and case law dealing with discriminatory employment practices have added modification to these principles. Discriminatory motives even though they constitute only a partial basis for an employer's refusal to hire are not sanctioned. Smith v. Sol D. Adler Realty Co., 436 F.2d 344 (7 Cir. 1970); Armstead v. Starkville Municipal Separate School Dist., 325 F.Supp. 560 (N.D.Miss.1971); Stebbins v. Keystone Ins. Co., 2 F.E.P. Cases 861 (D.D.C. 1970). In other words the protected activities of Green cannot give the employer even partial cause to deny the employment. It is argued that it is unrealistic to think that an employer must hire an individual who vigorously, and at times even unlawfully, challenges the company's fairness and integrity. The syllogistic conclusion is that the applicant has bit the hand he asks to feed him. Yet to the limit that the law protects an individual's right to protest unlawful discrimination, by exercise of free speech and free assembly, an employer is precluded from the use of coercive or intimidating sanctions to circumvent the law's protective cloak. The hard nut of it all is that the public interest to be carried out in the legislative requirement of fair and equal employment practices possesses a higher value than the likes or dislikes of a particular employer.

Thus, when an employee challenges his rejected employment as a violation of the civil rights law and makes a prima facie case of discrimination as has been done here,[1] the record must demonstrate more than a mere subjective reason, as Judge Bright authoritatively demonstrates, for the employer's action. The evidence must show that the employee's lawful activities under § 2000e–3a were in no part a motivating factor in the employer's decision and that the reason for the rejection is objectively related to job performance. Without this showing any

reason could otherwise be used to mask the denial of protected rights.

JOHNSEN, Senior Circuit Judge (dissenting in part).

I.

I agree with the holding in subdivision I of the majority opinion that Green's attempt to assert a claim under 42 U.S.C. § 1981 in 1970, for his layoff which occurred in 1964, was barred as a matter of limitations.

I also agree with the holding in subdivision II that the "stall-in" activity engaged in by Green against McDonnell constituted an unlawful form of protest and was without any right of protection under 42 U.S.C. § 2000e–3(a).

I further agree with the holding in subdivision III that the district court was mistaken in its initial view and ruling that Green could not make assertion in his complaint of a claim that he had been denied rehiring because of his race, since the Equal Employment Opportunity Commission had not made a finding that reasonable cause existed to believe that this basis had underlain McDonnell's refusal to rehire him. The question has not been passed upon by the Supreme Court, but such an array of decisions by the lower federal courts exists thereon that I think it presently must be regarded as accepted law that where charges of violation of Title VII of the Civil Rights Act of 1964 have been lodged with the Commission, and the Commission thereafter notifies the complainant that it has not been able (for whatever reason) to effect compliance in respect thereto, the failure of the Commission to make a finding of reasonable cause on some particular charge does not preclude that charge from being asserted as a claim in a suit brought under § 2000e–5.

II.

I am not, however, able to agree with the holding in subdivision II that Green

---

1. Cf. Marquez v. Omaha, Ford Motor Co., 440 F.2d 1157 (8 Cir. 1971).

had no such part in the "lock-in" activity involved as to enable it to be regarded as an unlawful form of protest on his part against McDonnell.

The "lock-in" was the focal point of a demonstration which was planned and put on against McDonnell by an activist organization calling itself ACTION. Green was chairman or head of the organization. In organizing the demonstration, it would be only natural conduct, as common experience is able to attest, that the members would communicate and discuss with Green, as their chairman and leader, the activities which were organizationally to be engaged in. Further, the record to me carries sufficient implication that this was indeed the actual fact of the situation. There is no testimony that Green had delegated to anyone the role of serving as leader of the ACTION group for the occasion or that anyone had presumed to take over and carry on this function for him. Green admitted having knowledge that a part of what was going to be done was to chain and padlock the doors of the office building.

The building housed a part of McDonnell's offices, and a staff of McDonnell's employees was working in it at the time. I should have supposed that, within common experience, no one could have any difficulty in believing that the primary objective of the affair was to be the locking up of McDonnell's employees in the building, and that it was because of this unlawful aspect that the matter was taken up with Green as the organization's head.

The majority opinion passes all this off with the mere statement that "The record does not support the trial court's conclusion that Green 'actively cooperated' in chaining the doors of the downtown St Louis building during the 'lock-in' demonstration". The concurring opinion, apparently to give this a bit of bolstering, engages in adding:

> "The record shows that one of the grounds stated by Mr. Windsor, defendant's Director of Personnel Services, for the refusal to hire Green was

because he had 'chained the doors of the Roberts Building'. There is no evidence which supports this charge. On the day of the 'lock-in', Green was engaged in protected picketing activities. He was told by one member of the picketing group that someone was going to chain the doors of the Roberts Building. When Green arrived at the scene, the chain had either already been removed or officials were in the process of removing it. A complete stranger to this litigation did the chaining. Evidence of mere subjective approval of this incident at the time of trial is not proof of Green's direction or authorization of it. Only if it could be shown that a principal-agent relationship existed between Green and the active participants can their wrongdoing be imputed to him".

I have some difficulty with these statements. I pause on them only because they appear to be accepted and made part of the majority opinion, by Judge Bright's statement therein, "*See* Judge Lay's concurring opinion, *infra*". Thus the position of the majority seems to be that no responsibility for the chaining of the doors can properly be attributed to Green because, from his own testimony, he did not personally do the act and McDonnell did not show that he had commissioned the others to do it for him.

I think this overlooks the reality that the demonstration was not one made by a mere aggregation of separate individuals, each of whom was intendedly free to carry out his own aims and engage in such personal actions as he might see fit. As I have indicated, it was conduct engaged in by the membership of ACTION as a body. It was concerted action planned and taken by the organization. It was heralded and was intended to have attribution and credit given to the organization ACTION. It was action carried on by those who went to the scene as the membership body of ACTION. Its focal point was intended to be the chaining and padlocking of the doors of the building. Because of the character of this aspect, it would be only

natural, as I have said, within ordinary experience, that it should be and had been taken up with Green in his organizational prerogatives.

To repeat—like the district court, I have no difficulty regarding it as a rational inference, (1) that the communication with Green was done for the purpose of having him give assent and authorization thereto; (2) that with the chaining and padlocking being carried out as planned, Green had in fact given it such approval and authorization; and (3) that further, with no other reason or basis being shown therefor, Green's presence at the scene could only have been for the purpose of constituting a participation by him in the organization's intention and action of chaining the doors of the building and of giving any direction and other assistance necessary to have it accomplished.

Thus, in my view, McDonnell could properly regard Green as having responsibility for the chaining and padlocking and as having intended this to constitute a targeting on his part of McDonnell. In the unlawfulness of the act, his responsibility as to McDonnell would be a personal one; it could not be shunted off by him on the basis of official cloak or shield. I am therefore not quite able to understand how it can realistically be said that all Green did was "to make a mere subjective approval of this incident at the time of trial". It seems to me that in making reversal of the trial court's finding as to Green's responsibility for the "lock-in" action, the majority have engaged in artificiality.

### III.

McDonnell's right to consider the question of rehiring Green thus was, in my opinion, entitled to have as its basis both the "lock-in" and the "stall-in" action which had been engaged in against it. The majority opinion merely makes reference to the "stall-in" situation; it does not set out the facts. Rows of cars were lined up across all four of the public highways from which entrance had to be made to the McDonnell plant

area. The blockades were set up just before a shift of some 10,000 employees was due to arrive for work. The plant, with its total of over 30,000 employees, was being operated in three shifts. The members of the shift which the 7:00 a. m. one was to replace would thereupon be leaving for their homes.

It is not difficult to envision—and indeed it seems to me that McDonnell could hardly escape having concern for this aspect—what consequence the blockade could and presumably was intended to effect, in its public significance, in its substantial disruption of plant operation, and in natural reaction on the part of the vast number of employees whose right of ingress and egress were sought to be thwarted. It happened that these consequences were averted, not by any change in conscience on Green's part, but by the prompt action of the police in breaking up the blockade and in placing Green under arrest. The record does not enable any subjective immunity to be accorded Green on the "stall-in" events, as has been done in relation to the "lock-in" action, for Green chose not to try public-wise to deny or to justify the unlawful action of tying up general highway traffic and seeking to prevent 10,000 of McDonnell's employees from getting to their work, but elected instead to engage in the expedient of pleading guilty and being permitted to pay a fine of $50.00 for the traffic violation.

It was both the "stall-in" and the "lock-in" situations with which McDonnell was faced when Green presented himself at its personnel office and made application for one of the newly-opened jobs that had been advertised. As noted, I think both of these situations were properly entitled to be given consideration by McDonnell on the question of rehiring Green. The majority have now, however, closed the door upon McDonnell's right to give any consideration to the "lock-in" affair. But even on the "stall-in" situation alone, I should not suppose that a Gallup poll would be needed to show that any employer with self respect and with concern for his rela-

tions with his other employees hardly would hire a workman, whether white or black, who had engaged in such an unlawful and indicative misdeed against him, against his employees, and against his business being permitted to operate.

I am therefore not able to see how any presumption of racial discrimination would legally be capable of attaching or could rationally be given application to such a situation. Green could have no right to have the question of hiring consideration dealt with in these circumstances differently than would be done by McDonnell in relation to any other person, white or black, who had engaged in such unlawful conduct against it. It is familiar fact that whites, as well as blacks, have through the years engaged in illegal acts, such as the "stall-in" and "lock-in" here and other possession-takings and worse, against particular businesses and employers, for varying reasons, sometimes personal, sometimes social, and sometimes political.

But whatever the reason therefor, one who has committed such unlawful deeds against some business and then seeks to be hired by it, does not, in my opinion, stand in any different position or have any right to different treatment because he is a black, than if he were a white, in relation to the right of refusal to hire him. Of course, racial motivation may not enter into such a situation in relation to a black. On the prima facie aspect, however, created by the commission of the illegal deeds here involved, it cannot, in my judgment, properly be held that nevertheless if the perpetrator has been a black, the situation should be regarded as one of prima facie racial discrimination.

### IV.

But the majority opinion goes still farther in its holding in subdivision V. If I read the statements in this subdivision correctly, together with some of those appearing in subdivision IV, the effect of the court's holding is that, even though the actual reason for McDonnell's refusal to hire Green was the unlawful acts which he had committed against it and no racial motivation was involved therein, this would not be able to constitute a justification for its not hiring him.

In subdivision IV, the statement is made that "Additionally, as discussed in part V below, the district court failed to consider whether the reasons given by McDonnell for not rehiring Green were related to the requirements of the job". Subdivision V then goes on to declare:

"When a black man demonstrates that he possesses the qualifications to fill a job opening and that he was denied the job, we think he presents a prima facie case of racial discrimination and that the burden passes to the employer to demonstrate a substantial relationship between the reasons offered for denying employment and the requirements of the job. Here, McDonnell has not demonstrated by any testimony or other evidence that Green's participation in the 'stall-in' would impede his ability to perform the job for which he applied. There is no evidence that Green's conduct would cause fellow employees or supervisors to refuse to cooperate with Green, thereby disrupting plant operations".

I had thought the question in the case was whether, in the denial of employment to Green, the situation either was one in which McDonnell had acted with some racial motive, or otherwise was one in which there did not exist an equal opportunity for Green to get a job with a white person that had engaged in doing the same things against it Green had done. Under Title VII, no racial discrimination may exist as to Negro employment, either actually in the form of racial bias or operatively in not producing the same degree of employment opportunity with a white person (other than in a respect recognized by the statute).

The effect of the majority holding is, as I view it, that even though no racial motivation was in fact involved on the

part of McDonnell, and even though its refusal to hire anyone who had engaged in such unlawful acts against it as were involved would not afford Green any less opportunity for employment than it did a white who had engaged in the same unlawful acts against it, McDonnell could nevertheless not refuse to hire Green unless his presence in the plant would disrupt its operations.

The holding purports to be predicated on a sentence in Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) that "If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited". But this sentence may not be read apart from the one which immediately precedes it: "The [1964 Civil Rights] Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation".

The thrust of *Duke*, as I read it, is that, within the purpose and scope of the 1964 Act, a lack of equal opportunity, and hence a discrimination, is created by an employer's utilization of practices, procedures or tests which, even though not so intended, operatively produce the result of keeping blacks from obtaining jobs or of not being able to progress to other jobs or classifications the same as whites, where the things so utilized are without any significant relationship to a performance of the work involved.

I do not see in this a warrant for a holding that refusal by an employer to hire a person who has engaged in such illegal conduct against it, as is here involved, is entitled to be deemed to operate as a lack of equal opportunity in employment, if the one who has done the misdeeds is a Negro. Surely, the majority does not mean to say that a Negro will not have equal opportunity for employment within the intent of Title VII unless unlawful acts committed by him against a business or an employer are required to be condoned, although American concepts have never required such a business condonation as to a white.

I take the liberty of adding a word, in realistic certainty and not in mystic prophecy, as to what the significance and result of the majority's holding will actually be. While the opinion allows McDonnell "the opportunity to present evidence" on whether Green's "stall-in" misdeeds "could impede his ability to work harmoniously in surroundings characterized by close personal, or working, relationships among employees or between employees and management", that opportunity can hardly under the indications and intimations of the opinion, constitute more than a theoretical and hollow one to McDonnell.

The opinion says that McDonnell must be able to make proof "in some objective way" that Green's presence in the plant would disrupt its operations. Testimony on the part of McDonnell's officials as to what their opinion would be on this aspect would not be able to meet the court's prescription, in light of its further declaration that "employment decisions based on subjective, rather than objective, criteria carry little weight in rebutting charges of discrimination".

Nor would I think that McDonnell could properly go around in the plant and undertake to canvass its employees on how they would feel if Green were to be rehired. And if McDonnell did presume to do so, one would have to be naive to expect that an employee who might have feelings or concern would be willing to make such an expression—although within factory life he might not hesitate to manifest his attitude toward Green upon a favorable opportunity presenting itself in the plant for personally doing so. Beyond this, even if some employee might be willing to so declare and testify, this would only carry the situation onto the side track of a charge of racial bias being hurled against him.

What the court has held can therefore, in my opinion, only mean that McDonnell is being required to rehire Green.

## V.

The opinion contains still another ground for making reversal. I have previously indicated my agreement that the district court was mistaken in its initial view and ruling that Green was not entitled to make assertion in his complaint of a claim that he had been denied rehiring because of his race. I am not able, however, in the circumstances shown by the record, to agree with the holding in subdivision IV that the initial striking from the complaint of Green's allegation of racial motivation entitles him to a reversal of the judgment.

Despite the district court's initial pleading ruling, Green was allowed discovery in respect to McDonnell's requirements for employment, on the nature of the tests and interviews given, on the exemptions made therefrom, and on the weight accorded to the ratings arrived at from these processes, as they existed at the time of his application for rehiring. He had access to and introduced evidence at the trial on what the racial composition of the work force at the plant had been during a substantial number of years, and as to the applications, terminations, status changes, classifications, et cetera, which had been involved as to nonwhite persons. He was permitted to give detailed testimony at the trial on his own employment history at the plant, including all incidents which he regarded as having racial significance, such as conversations had with him about the matter of his personal grooming and the attire worn by him. Indeed, such was the volume of this that the majority opinion takes occasion to note "the commendable zeal displayed by his counsel in producing an abundant record of events and circumstances relating to Green's employment relationship with McDonnell".

It is clear to me that at the trial the district court did not adhere to its initial pleading ruling. It is also clear that Green's counsel, from the evidence which he adduced at the trial, did not regard himself as being subject to any such restriction. It further is clear from the character and scope of Green's personal testimony that he had such familiarity with the plant as to provide rational basis for inferring that he could and would have produced instances of discriminatory practices if these had existed in the plant.

The district court appraised all of the evidence thus produced and found that it did not indicate or suggest that "defendant was motivated by racial prejudice in its refusal to rehire Green". The court recognized and declared in its Memorandum that the "controlling and ultimate" considerations in the situation were whether the "stall-in" and "lock-in" actions of Green were "the real reasons for defendant's refusal to rehire the plaintiff", and whether, if they were, this could constitute sufficient basis legally to "justify defendant's refusal to rehire [the plaintiff]".

The majority take the abstract position here, that "We cannot say that the district court's action in striking the racial discrimination claim did not hamper the preparation and presentation of Green's case". With the lack of adherence to its pleading ruling which the district court engaged in; with the scope and character of the discovery which the court allowed; and with the nature and extent of the evidence which Green's counsel produced at the trial—the practical effect of the majority's holding can only be that the district court must now accord Green the full extent of the discovery which he sought To me, Green was allowed sufficient representative information—part of whose character and scope I have indicated above—so that no reversible error existed in the court's denial of his burdensome and harassing initial request to be given access to some 200,000 general McDonnell files or of his later request to be permitted to go through some 70,000 individual employment files. The denials which the court made and the alternatives which it allowed in relation to Green's requests seem to me to be well within the scope of the judicial discretion which the court had a right to exercise in the situation.

Again, I do not hesitate to state that I am certain, that, after all the discovery has occurred to which Green has now been given access, no more objectivity is likely to be produced thereby than that which can be argued to exist in the representative information, figures, et cetera, to which Green has had access and which he adduced at the trial.

### VI.

For the reasons I have indicated, I respectfully must dissent from the reversal made of the judgment, and to each of the three separate grounds on which it has been predicated.

### ORDER ON PETITION FOR REHEARING

In response to a petition by McDonnell-Douglas Corporation for a rehearing, the majority of the court have decided to modify the court's opinion by striking Part V thereof and substituting a revised Part V, which is set forth below.

Circuit Judge Lay joins in the revised opinion and adheres to his prior separate concurring opinion.

Circuit Judge Johnsen dissents and files a supplemental dissenting opinion, which is set forth below.

In light of these modifications, the court denies McDonnell-Douglas Corporation's petition for a rehearing en banc for the reason that the petition has failed to obtain the vote of a majority of the Circuit Judges who are in regular active service. A rehearing before the panel is likewise denied.

The denial of the rehearing is without prejudice to the right of either party to file a petition for a rehearing on the court's modified opinion.

BRIGHT, Circuit Judge.

### V.

The record shows that McDonnell has taken the position that it has the right under Title VII to make subjective hiring judgments which do not necessarily rest upon the ability of the applicant to perform the work required. Upon that hypothesis, and apparently because the pleadings did not require McDonnell to defend the charge that its refusal to rehire Green was racially motived, McDonnell rested its case upon a showing that Green had participated in unlawful civil rights activities as reasons for declining to rehire him.

■■ Our prior decisions make clear that, in cases presenting questions of discriminatory hiring practices, employment decisions based on subjective, rather than objective, criteria carry little weight in rebutting charges of discrimination. *See* Moore v. Board of Education of Chidester School District No. 59, Chidester, Ark., 448 F.2d 709 (8th Cir. 1971). *See also* Carter v. Gallagher, 452 F.2d 315 (8th Cir., 1971). We reaffirm this principle here. "If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). In enacting Title VII, Congress has mandated the removal of racial barriers to employment. Judicial acceptance of subjectively based hiring decisions must be limited if Title VII is to be more than an illusory commitment to that end, for subjective criteria may mask aspects of prohibited prejudice. Employers seldom admit racial discrimination. Marquez v. Omaha District Sales Office, Ford Division, 440 F.2d 1157, 1162 (8th Cir. 1971). Its presence is often cloaked in generalities or vague criteria which do not measure an applicant's qualifications in terms of job requirements. Consequently, a black job applicant must usually rest his case of discrimination upon proof that he possessed the requisite qualifications to fill the position which was denied him. In this case, it is undisputed that Green possessed the requisite skills to perform the work for which he applied, and that McDonnell was seeking qualified applicants at the time it refused to hire him and continued to seek qualified appli-

cants thereafter. Moreover, Green's prior performance with McDonnell had earned him a "satisfactory" rating.

When a black man demonstrates that he possesses the qualifications to fill a job opening and that he was denied the job which continues to remain open, we think he presents a prima facie case of racial discrimination. However, an applicant's past participation in unlawful conduct directed at his prospective employer might indicate the applicant's lack of a responsible attitude toward performing work for that employer.

Of the several civil rights protests which Green directed against McDonnell, the employer selected two, the "lock-in" and the "stall-in", as reasons for its refusal to rehire Green. Green should be given the opportunity to show that these reasons offered by the Company were pretextual,[6] or otherwise show the presence of racially discriminatory hiring practices by McDonnell which affected its decision.

The district court did not use appropriate standards in determining whether McDonnell's refusal to hire Green was racially motivated. On remand, both parties will have the opportunity to present evidence on this matter.

The amount of lost earnings claimed by Green is not great,[7] but the parties regard this as an important case and have devoted substantial time and energy to its litigation. Although the litigation is still not completed, we deem it appropriate to allow appellant a reasonable attorney's fee for this appeal, to be taxed as costs, upon counsel's submission of an estimate of his fee containing details of his services and time spent on this appeal. *See* 42 U.S.C. § 2000e–5(k).

JOHNSEN, Senior Circuit Judge, in supplemental dissent.

Modification and substitution has now been made as to subdivision V of the previously-filed majority opinion. For convenience and facilitation in checking whether this represents anything more than a language change, I set out the modifications.

### A.

The statements in the second and third sentences of the first paragraph of the subdivision as previously filed, reading,

" * * * McDonnell made little effort to show that Green's participation in the 'stall-in' would affect his ability to perform the job or to work harmoniously with other employees and supervisors. We need to evaluate this position in light of our cases dealing with job discrimination based on race",

have been changed to read,

" * * * McDonnell rested its case upon a showing that Green had participated in unlawful civil rights activities as reasons for declining to rehire him."

### B.

Paragraphs 3, 4, and 5 of the subdivision as previously filed, reading,

"When a black man demonstrates that he possesses the qualifications to fill a job opening and that he was denied the job, we think he presents a prima facie case of racial discrimination and that the burden passes to the employer to demonstrate a substantial relationship between the reasons offered for denying employment and the requirements of the job. Here, McDonnell has not demonstrated by any

---

6. McDonnell advanced an unsupported charge that Green had "actively cooperated" in the "lock-in." *See* Judge Lay's concurring opinion, *infra.*

7. The record shows that Green obtained reasonably equivalent employment subsequent to July 26, 1965, the date when McDonnell refused to rehire him. Under these circumstances, the district court may limit relief, if any is to be given, to damages based on Green's loss of earnings between July 26, 1965, and the date on which he acquired reasonably equivalent employment, which loss Green estimated to be between four and five thousand dollars.

testimony or other evidence that Green's participation in the 'stall-in' would impede his ability to perform the job for which he applied. There is no evidence that Green's conduct would cause fellow employees or supervisors to refuse to cooperate with Green, thereby disrupting plant operations.

"In this connection, we note that McDonnell employs over thirty thousand men and women at its St. Louis plant. The record demonstrates that few employees were actually affected by the 'stall-in'. We recognize that an employee's participation in an activity such as a 'stall-in' could impede his ability to work harmoniously in surroundings characterized by close personal, or working, relationships among employees or between employees and management. This problem might be present at McDonnell, but the record is bare on this point. This aspect of the case remains for further exploration. On remand, McDonnell will have the opportunity to present evidence on this matter.

"We do not, as does the dissent, construe this remand as a command to McDonnell to rehire Green. The remand is required because the district court did not use the correct standard in determining whether McDonnell's refusal to rehire Green was racially motivated. If McDonnell can demonstrate that Green's participation in the 'stall-in' in some objective way reflects adversely upon job performance, McDonnell's refusal to rehire Green will be justified. But, if McDonnell's refusal to rehire Green rests upon management's personal dislike for Green or personal distaste for his conduct in the civil rights field, Green is entitled to some relief.",

have been changed to read (omitting here the footnote),

"When a black man demonstrates that he possesses the qualifications to fill a job opening and that he has been denied the job which continues to remain open, we think he presents a prima facie case of racial discrimination. However, an applicant's past participation in unlawful conduct directed at his prospective employer might indicate the applicant's lack of a responsible attitude toward performing work for that employer.

"Of the several civil rights protests which Green directed against McDonnell, the employer selected two, the 'lock-in' and the 'stall-in', as reasons for its refusal to rehire Green. Green should be given the opportunity to show that these reasons offered by the company were pretextual, or otherwise show the presence of racial discriminatory hiring practices by McDonnell which affected its decision.

"The district court did not use appropriate standards in determining whether McDonnell's refusal to hire Green was racially motivated. On remand, both parties will have the opportunity to present evidence on this matter."

C.

I am not certain as to the intended effect of these changes, and I suspect that the district court also will have difficulty in trying to assess the significance of the substituted language.

Thus, while the previous indication in the first paragraph of the subdivision has been stricken that McDonnell was required "to show that Green's participation in the 'stall-in' would affect his ability to perform the job or to work harmoniously with other employees and supervisors", the statement has been left standing in subdivision IV that "Additionally, as discussed in part V below, the district court failed to consider whether the reasons given by McDonnell for not rehiring Green were related to the requirements of the job".

Further, the language used in the third paragraph of subdivision V, as to the burden resting on McDonnell "to demonstrate a substantial relationship between the reasons offered for denying employment and the requirements of the job"

and that "McDonnell has not demonstrated by any testimony or other evidence that Green's participation in the 'stall-in' would impede his ability to perform the job for which he applied", has now been changed to read, "However, an applicant's past participation in unlawful conduct directed at his prospective employer might indicate the applicant's lack of a responsible attitude toward performing work for that employer".

The difficulty I have with all this is that the opinion continues to adhere to the position that such unlawful acts as Green committed against McDonnell would not legally entitle McDonnell to refuse to hire him, even though no racial motivation was involved, although they would entitle and would cause it to do so in the case of white persons. In taking the position that such unlawful and immediate misdeeds do not of themselves, even though no racial motivation is involved, provide a sufficient basis for McDonnell to refuse to hire Green, the majority thus are holding, not that Green is entitled to the same opportunity as a white, but that he is entitled to one of a different and greater degree.

As indicated in my original dissent, I am not able to read Title VII of the Equal Employment Opportunity Act of 1964 as providing for such an inherently different employment opportunity or such a curbing employer prescription, nor do I believe that Congress, as a matter of respect for law adherence, would presume to impose such a requirement of business condonation upon employers in respect to the commission of unlawful acts against them, such as are here involved. And in the majority's holding that, even though no racial motivation was involved, McDonnell was not entitled to refuse to hire Green because of his unlawful misdeeds against it, but that something more than this would have to exist in the situation, I confess that I am not able to see any practical difference, so far as McDonnell's situation is concerned, between the opinion's original statement, that it must be shown that the hiring of Green would result in "dis-rupting plant operations" and its substituted statement that "an applicant's past participation in unlawful conduct directed at his prospective employer might indicate the applicant's lack of a responsible attitude toward performing work for that employer".

Any proof that would be possible in attempting to show that Green would be an industrial handicap to the operation of the plant, would necessarily involve opinion or subjective testimony which, as pointed out in my original dissent, the majority opinion declares to be of "little weight in rebutting charges of discrimination".

I do not desire to prolong this discussion further, except to reiterate, as noted in my original dissent, that I believe the majority have engaged in a mistaken interpretation of the holding in Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). I adhere to my original dissent, with this supplemental expression added.