**Margaret Ann GOSSIN, a/k/a Margot Gossin, Plaintiff,**

v.

**Robert L. HUSKEY et al., Defendants.**

**No. 71 C 306(2).**

United States District Court,
E. D. Missouri, E. D.

Aug. 31, 1972.

Louis Gilden, St. Louis, Mo., for plaintiff.

Ziercher, Tzinberg, Human & Michenfelder, Clayton, Mo., for defendants.

## MEMORANDUM OPINION AND ORDER

REGAN, District Judge.

Margaret Ann Gossin, a 32-year old black, was employed as a teacher in June, 1968, by the Special School District of St. Louis County, Missouri. In August, 1969, she was appointed Acting Supervisor in the Auditorily Impaired Section of the District, and thereafter, in April, 1970, was made Supervisor for the 1970–1971 school year. This lawsuit stems from the refusal of the District to continue plaintiff in her supervisory position for the 1971–1972 school year and her rejection of a tendered teacher contract for that year. The basic issue for our determination is whether racial or other constitutionally impermissible considerations played a part in the decision of the District. We have jurisdiction under Section 1343(3) and (4), 28 U.S. C., and Sections 1981 and 1983, 42 U.S. C.

The Special School District is a public school district encompassing the entire County of St. Louis, superimposed over and separate from the many other public school districts in the county. It has the responsibility for educating and training all physically and mentally handicapped children in the county and for furnishing vocational education for high school students. It operates six schools for the handicapped in addition to more than 70 rented classrooms in school buildings of the regular school districts, as well as two technical-vocational schools. The district also owns and operates 120 school buses to provide transportation for its students. It employs a superintendent, 4 assistant superintendents, 3 coordinators, 30 supervisors, approximately 500 teachers and about 700 other full-time and part-time personnel.

Plaintiff is thoroughly grounded in the field of the education of deaf and speech-handicapped children, and before entering the employ of the Special District taught at various private schools for the deaf from 1957 to June, 1968. Prior to July, 1971, her immediate supervisor in the District was Dr. William C. Healey, then Coordinator of the Auditorily Impaired Section (located in Litzinger Annex) and several other departments. It was Dr. Healey who initially recommended the employment of plaintiff as a teacher.

The following year, after Dr. Healey had concluded that the then Supervisor at Litzinger Annex was not performing satisfactorily and should be replaced in the Auditorily Impaired Section, he recommended to defendant Oral W. Spurgeon, the Superintendent of the District, that plaintiff be appointed Acting Supervisor to begin serving in that capacity immediately. Spurgeon followed Healey's recommendation and plaintiff began her service as Acting Supervisor. Thereafter, in September, 1969, the Board of Education of the District ratified the appointment. The subsequent appointment of plaintiff as Supervisor for the year 1970–1971 was also made on the recommendation of Dr. Healey. As of July, 1970, Dr. Healey voluntarily left the employ of the District, and late that month was succeeded as Coordinator (on an acting basis) by defendant Robert Huskey.

In March, 1971, Superintendent Spurgeon, on the basis of information furnished to him by Huskey and his own investigation, recommended to the Board of Education that plaintiff not be rehired as supervisor but that she be offered a teacher's contract. The Board accepted this recommendation. The theory of plaintiff is that the vote to reassign her from a supervisory to a teaching position was motivated in whole or in part by racial considerations.[1]

Concededly, plaintiff has no tenure as Supervisor and under Missouri

---

1. Additionally, plaintiff claims that her termination as supervisor was violative of her First Amendment right of free speech.

As appears infra, we find this charge without any foundation in the credible evidence.

law may be terminated as such for any or no reason other than one which would be violative of her constitutional rights. "The [School] Board has the right to decide whom they will employ and re-employ so long as the non-employment is not based on some impermissible constitutional ground * * *." Williams v. School District of Springfield R–12, Mo., 447 S.W.2d 256. Cf. Freeman v. Gould Special School District of Lincoln County, Ark., 8 Cir., 405 F.2d 1153.

We note initially that the present is not a Title VII case as were Parham v. Southwestern Bell Telephone Co., 8 Cir., 433 F.2d 421, Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, and Green v. McDonnell Douglas Corporation, 8 Cir., 463 F.2d 337, decided May 12, 1972, nor is this a case involving the failure of a school district to provide employment for a black teacher following the integration of a previously segregated school system as were Moore v. Board of Education of Chidester School District No. 59, Chidester, Ark., 8 Cir., 448 F.2d 709 and Sparks v. Griffin, 5 Cir., 460 F.2d 433.[2]

■ There is not a scintilla of credible evidence that the Special School District has racially discriminatory hiring practices.[3] At all times, at least since Brown I, (Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873) the schools in the district have been completely and honestly integrated. So far as this record would indicate, plaintiff is the only black with whom the district has had any controversy. We are aware that in Title VII cases courts "listen" to statistics where, as here, there are relatively few black employees, but even so, as held in *Parham*, an individual who complains that his employer rejected his application for employment on account of his race must nevertheless recover, if at all, on the strength of his own case.

Unquestionably, direct evidence of racial discrimination is not required. Plaintiff in the present case relies on thinly drawn, forced, and weak inferences, partly from testimony we do not accept as the more credible and partly from perfectly legitimate conduct of defendants. If plaintiff may be said to have made a prima facie case of racial discrimination simply by showing that she is black and possesses the "technical" qualifications for the job of Supervisor, it is our opinion that defendants have clearly overcome such showing and convincingly demonstrated the constitutional and statutory bona fides of their conduct.

The allegation that plaintiff was demoted because of her exercise of her First Amendment right of free speech, a charge we find unfounded, is based on a few isolated sentences in plaintiff's lengthy testimony covering over 400 pages of the transcript. By way of background: On January 21, 1971 plaintiff met with Huskey and Spurgeon at the latter's office and was then told that a tentative decision had been reached adverse to a renewal of her supervisor contract. Plaintiff testified that after a discussion of the complaints against her and her response thereto, Spurgeon stated that if she discussed the matter "outside of this meeting * * * then we will have to terminate your responsibilities as supervisor immediately. That is to stay entirely within this office, the three of us." We do not credit this testimony. It is plain to us that what really happened is that Huskey and Spurgeon merely agreed that for plaintiff's benefit they would keep confidential their tentative recommendation. Not even plaintiff claims the matter of "outside" discussion was ever mentioned again. In addition, not only did plaintiff in fact disregard this alleged caveat and discuss with others the substance of

---

2. We do not, of course, mean to imply that a racially discriminatory hiring practice is permissible in any context.

3. Plaintiff testified that she did not know of any person who was refused a job because of color nor of any employee who was denied promotion because of race or color.

the January 21 conference (without being terminated "immediately" or otherwise disciplined), but the formal decision of Spurgeon and Huskey to recommend "termination" at the end of the school year (for reasons wholly unrelated to such "outside" discussion) was not made until sometime in March.

Under no view of the credible evidence can it be said that the decision to reassign plaintiff to her former position as teacher was arbitrary and therefore suspect. There is no trumped-up charge of professional incompetency. To the contrary, from the very inception defendants have conceded not only that plaintiff is a superior teacher but that she has the "technical" qualifications for the position of supervisor. However, mere "technical" qualifications do not suffice. The overwhelming weight of the evidence establishes the vital importance of a good friction-free relationship between the supervisor and the teaching staff.

We have no doubt from the evidence that Huskey is a dedicated educator motivated solely by a desire to operate a good department in an atmosphere of harmony, and that plaintiff's reassignment resulted from his honest and sincere conclusion, concurred in by Spurgeon and the Board, that to continue plaintiff as a supervisor would adversely affect the morale of the teaching staff. Huskey had other complaints, including plaintiff's treatment of some parents, but Spurgeon and the Board members were primarily concerned with plaintiff's relationship to the teachers she supervised.

The evidence is persuasive that tensions and anxieties had built up in the teaching staff at Litzinger Annex which either did or could affect the teaching program in the school, and that even though it may have been unwitting on her part, plaintiff was largely responsible for creating and continuing such tensions. The tone of voice, the attitude, the words employed by plaintiff in her dealings with the teachers on many occasions resulted in building up fears, unrest, anxiety and tensions in many of the teachers. It was not uncommon for teachers to become noticeably distraught and tearful immediately after conferences with plaintiff.

The very nature of teaching deaf children was such as to cause some tensions. For that reason it was essential that existing tensions be lessened, not increased. Unfortunately, when apprised thereof, plaintiff could not accept the legitimacy of the complaints against her or even attempt to root out the causes thereof with the individual teachers. True, plaintiff was not consistently abrasive, but that very inconsistency added to the tensions. The situation had deteriorated to such an extent that in light of their past experience, some of the teachers simply avoided discussing their professional problems with plaintiff.

The tensions had existed prior to the advent of Huskey. The only difference was that when most of the teaching staff at Litzinger Annex had joined in drafting a communication informing Dr. Healey of their complaints against plaintiff, he rejected the validity thereof after consulting with plaintiff and threatened the teachers with discharge unless they "cooperated." This approach did not eliminate the problem. As we view the testimony, had plaintiff made an adequate attempt to relieve the tensions and avoid the attitudes and actions on her part which caused them, she would have been retained as supervisor.

That plaintiff may have sincerely believed that the staff complaints were unfounded is beside the point. The tensions were unquestionably present and many of the teachers were known to be unhappy.[4] The situation had reached a point where defendants could reasonably believe that only the elimination of

---

4. In these circumstances, plaintiff's argument that the Board's decision to reassign her was based on subjective, rather than objective criteria, flies in the face of reality.

plaintiff as supervisor would avoid further deterioration of morale at Litzinger Annex. Even the teachers who testified in support of plaintiff conceded they were aware of the existence of the tensions. In fact, one such teacher, who considered herself a close personal friend of plaintiff and admired her both professionally and as an individual, testified that she believed that in view of the unrest among the teachers, the children would be benefited if plaintiff were not continued as supervisor.

■ We find that there was adequate and factual basis for Huskey to conclude and for Spurgeon to concur that it was in the best interest of the school district that plaintiff be not retained as supervisor at Litzinger Annex, and that the Board had ample grounds, none of which was racially inspired or violative of plaintiff's right of free speech, for accepting the recommendation of Huskey and Spurgeon.

Our study of the 2,227 page transcript and the numerous and voluminous exhibits, buttressed by our personal observation of the witnesses, has led us to the firm conclusion not only that "racism" played no part whatever in the decision of the Special School Board and in the recommendations of Huskey and Spurgeon to the Board, nor in the staff complaints against plaintiff, but that all defendants are entirely free of racial prejudices either generally or as to plaintiff in particular.[5] Stated otherwise, we find from the credibile evidence that the color of plaintiff's skin was not a factor to any extent, either consciously or subconsciously, in the reassignment of plaintiff to a teaching position and that plaintiff was not treated disparately from white employees[6] or otherwise discriminated against or mistreated.

Plaintiff makes the further claim that she was not afforded procedural due process, in that the school district failed to accord her a full and fair hearing on her belated claim of racism. Briefly, the facts on this issue are: After Spurgeon notified plaintiff that he would recommend to the School Board that she not be retained as supervisor, plaintiff made a written request for and was granted a hearing before the Board on March 31, 1971. The request for the hearing made no charge or even intimated that Spurgeon's recommendation was motivated by racial prejudice or that racism was in any way involved.

At the hearing, upon request of plaintiff's attorney, Huskey orally stated the specific claims against her, all of which he and Spurgeon had previously made known to her. Following Huskey's statement, plaintiff made a lengthy presentation of her accomplishments and a denial of the merits of the charges on which the recommendation was based, again with no intimation that racial prejudice was in any way involved. She requested that several parents who had been solicited by her to appear on her behalf be permitted to testify. One such parent made an oral statement to the Board, and at the Board's suggestion the other parents submitted written statements of their views. No member of the teaching staff was present. However, plaintiff submitted numerous complimentary letters and notes, including some from staff members. It was not until this point had been reached in the hearing and as it was nearing a close that plaintiff's counsel, for the first time, made the charge that the recommendation of Spurgeon and Huskey was motivated by racial prejudice. Obviously shocked, the Board ruled that counsel was out of order, the Board president stating that racial prejudice was not a factor, and the Board took the matter under advisement.

Subsequent to the hearing, Huskey and Spurgeon became aware for the first time of the 1970 "staff" complaint

5. It is to be noted that when evidence was offered to the effect that defendants were free of prejudice generally, plaintiff's counsel made objection on the ground that the issue to be decided was prejudice directed specifically to plaintiff.

6. The fact is that plaintiff's predecessor as supervisor (a white man) was demoted.

which had been made to Dr. Healey and copies of this complaint were submitted to the Board members. In addition, each member of the teaching staff had been requested to write letters stating their feelings pro and con respecting the supervisor. A number of such letters (the existence of which had theretofore been made known to plaintiff's attorney) were shown to the Board's members at their next meeting, on April 8, 1971. These letters corroborated, inter alia, the charges respecting the existence of tension and the unhappiness of many of the teachers by reason of plaintiff's actions and attitudes toward them and the fact that some of the teachers had avoided discussing their problems with plaintiff because of fear they would be subjected to harassment. The Board considered this post-hearing evidence along with the letters which had been submitted at the hearing, and after a discussion, five of the six board members voted to offer plaintiff a contract as a teacher. The sixth member abstained.

 Plaintiff concedes that under ordinary circumstances, in view of her lack of tenure, she would not be entitled to a hearing. What she does contend (quoting from her brief) is that "a non-tenured teacher is entitled to procedural due process to protect a fundamental constitutional right, including the right to be free from racial discrimination." It is not necessary for us to definitively decide whether plaintiff was in fact accorded procedural due process in view of the June 29, 1972 decisions of the Supreme Court in Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570. These cases hold that public school teachers without tenure or a "reasonable expectancy" of reemployment under state law (and plaintiff had neither) have no right to a hearing when the school system fails to rehire them. A fortiori, the same principle is applicable to the reassignment of a teacher. Plaintiff was not denied procedural due process of law.

We hold that plaintiff has not been deprived of any right, privilege or immunity secured by the Constitution or laws of the United States.

The foregoing memorandum constitutes our findings of fact and conclusions of law. The Clerk is directed to enter judgment in favor of defendants and against plaintiff.